STATE OF TENNESSEE, Appellant,

*v.*

HARRY T. CRAWFORD, JR., Appellee.

470 S.W.2d 610

(*Knoxville,* September Term, 1971.)

Opinion filed September 7, 1971.

DAVID M. PACK, Attorney General, THOMAS E. FOX, Deputy Attorney General, Nashville, LEWIS W. MAY, District Attorney General, Mountain City, for appellant.

BURKETT McINTURFF, Kingsport, RICHARD W. PECTOL, Johnson City, for appellee.

MR. SPECIAL JUSTICE ERBY L. JENKINS delivered the opinion of the Court.

The defendant below was tried in the Washington County Criminal Court in February of 1969 for the alleged murder of his wife, Jo Anne Crawford. He was convicted by a jury of the offense of second degree murder and his punishment was fixed at fifteen years in the State Penitentiary. Motion for a new trial was overruled by the trial judge, and the defendant appealed to

the Court of Criminal Appeals, which court in a split decision reversed and remanded the matter, and this Court granted certiorari.

The State's case is made out of circumstantial evidence alone, and thus, this Court in determining the issues presented is in effect sitting as a jury to determine whether or not the facts as revealed to the trial jury were in our opinion strong and convincing enough to sustain the conviction and to warrant the sentence in the penitentiary imposed by the jury below.

The facts surrounding the death of the deceased, Jo Anne Crawford, as revealed by a very careful reading and re-reading of the record are as follows. The defendant and his wife were, as far as can be determined, happily married, lived in a comfortable apartment in the Boone's Creek community, and the defendant was employed as a laboratory technician at the Holston Valley Community Hospital. The record reveals no motive on his part to kill her.

On November 2, 1968, the defendant and his wife were accompanied by a young single couple to dinner and they had a number of alcoholic drinks. After going to the theater and after dinner, the two couples went to a night club known as the Crow's Nest where they danced and consumed more alcoholic drinks. During the evening and early morning hours, the four of them had consumed a fifth and a pint of whiskey, this being over a six or seven hour period. The record does not reveal how much the defendant and his wife consumed, but apparently they were at least partially intoxicated when they returned home at about 1:30 a.m., the single couple leaving about an hour later. The defendant and his wife went to

bed and engaged in sexual relations. After smoking a cigarette they finally went to sleep about 3:00 a.m.

At 6:00 a.m. the defendant, having been awakened by an alarm clock, went to the living-room, sat down on the couch and fell asleep again. At about 7:20 a.m. he re-awakened and telephoned his place of employment to report that he would be late. He noticed that his wife was still asleep. He drove to the hospital, arriving there at about 7:40 a.m. where he worked all day, no evidence being presented that he acted in any manner other than his usual self. Much was made of the fact that the defendant clocked out at 4:00 p.m. but left some time earlier or about 3:00 p.m., but this, according to fellow-workers, was a common practice. He drove home, arriving there at about 3:20 p.m. When he entered the bedroom and saw his wife had been killed, he immediately called the police, and this call was recorded by the operator to have been placed at 3:22 p.m., some two minutes after the defendant arrived home from work.

The defendant's wife had been brutally murdered, having been beaten over the head with a rifle barrel owned by the defendant and strangled by a pair of panty hose knotted in the back.

The defendant readily submitted to questioning for hours and steadfastly denied that he had killed his wife. At one point in the interrogation he stated, "General, I can care less what you do with me," and at another time he is quoted as saying, "Here's the damn shirt I wore today, I don't give a damn what you do with me."

While there was some insistence that someone unknown could have entered from a trap door in the attic and killed the deceased, this is purely speculative, except

that it was shown that there were some foot prints on top of the water heater. The time of death could not be ascertained, rigor mortis having set in and no technical witness was introduced with reference to the time of death.

■ In reviewing a conviction such as this where the defendant is convicted on circumstantial evidence alone, the mind of the Court must rest easy as to the certainty of guilt of the defendant, it of course, being the law that when a case is made by circumstantial evidence alone, that the circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt. While it is true that a jury verdict overturns the presumption of innocence, where it is apparent that justice has gone astray, there is precedent for this Court to review a question of fact in cases of this nature.

In *C. M. Stuart v. State*, 60 Tenn. 178, 1 Baxter, (1873), this Court cited with approval Judge Green's statement of the law contained in *Davis v. State*, 2 Hum., wherein Judge Green said as follows:

"In *Davis v. State*, 2 Hum., Judge Green said: 'The rule that this Court will not grant a new trial upon the facts, unless the jury shall appear to have been guilty of great rashness, does not apply to criminal cases. In such cases new trials have been constantly granted by this Court upon its conviction that the verdict was not warranted by the proof.' This rule has been uniformly followed ever since. The verdict of a jury is entitled to weight, it removes the presumption of the prisoner's innocence; we must, beyond doubt, recognize the superior advantages possessed by the jury and Judge below, in seeing and hearing the witnesses and a full

examination of the case, and they can judge better of the credibility of witnesses; making due allowance for all this, however, shall we give the same effect to the verdict of a jury by which a person is sentenced to death that we would where it simply settles the title to a horse or a cow? Without hesitation we say no.

"A plaintiff in a civil case is only required to make out his case by a preponderance of proof; if he obtains a verdict and judgment in his favor, and the case comes to this Court upon a mere conflict between witnesses, this Court will not undertake to weigh and balance testimony, to see upon which side the mere preponderance is.

"But in a case involving the life or liberty of the citizen, we cannot escape the responsibility. We cannot, in law or in conscience, affirm a judgment, when, after making all due allowance for the superior advantages of a jury, we can yet see that the jury were not warranted upon the facts in finding him guilty."

Thus, the Court cannot and will not sit idly by and, in effect, commit this defendant to the penitentiary when there remains a reasonable doubt that such judgment might be in error, and if upon a careful reading of the record of the trial court there is any doubt as to the guilt or the innocence of the defendant, such doubt must be weighed in favor of the defendant.

This case has given this Court great concern. The jury heard the witnesses and saw their demeanor, and the trial judge put his stamp of approval upon the verdict, but this Court would be remiss in its duty did we not examine with care the questions of fact under which the defendant was convicted. We will not close our eyes

to such questions and address ourselves only to questions of law and remain oblivious to the rights of defendants in criminal cases who stand convicted by circumstances as has this defendant. The facts must pass through the needle's eye of the Court. The Court of Criminal Appeals, as aforesaid, reversed and remanded the case in a split decision, thus, as aforesaid, we sit as a jury to decide a question of fact. This is not an easy task. Again, we realize the awesome responsibility faced by juries in criminal cases and also the great burden placed on trial judges.

█ █ In order to convict on circumstantial evidence alone, the facts and circumstances must be so closely interwoven and connected that the finger of guilt is pointed unerringly at the defendant and the defendant alone. A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. Mere suspicion and straws in the wind are not enough for circumstances take strange forms. Under our form of government and the administration of criminal justice, the defendant is clothed with a mantle of innocence and that presumption of innocence hovers over and protects him throughout the trial. Until this is overturned by strong proof of his guilt beyond a reasonable doubt, not an imaginary or captious doubt but an honest doubt engendered after a consideration of all the evidence so that the minds of the jurors cannot rest easy as to the certainty of guilt, he is entitled to an acquittal.

It is argued that the defendant, after discovering his wife's body made no outcry to the neighbors; that after the police arrived he smoked a cigarette; that there was

some controversy or some discrepancy about who bathed last the night or the morning before her death, and that he made the statements to the officers cited herein above.

It must be admitted in this case, as in most all cases, that there are some contradictions that could be construed as evidence of guilt. But, as we see it, these straws in the wind are not numerous or important enough to weave a net of guilt around the defendant from which he cannot escape. We cannot speculate a defendant into the penitentiary or permit a jury to do so.

Who among us can say what would be normal conduct or behavior of a man finding his wife brutally murdered under these circumstances. The pattern of human behavior in a time of emergency, crisis or grief is unpredictable. Sometimes, innocent men act guilty; on the other hand, sometimes guilty men portray a picture of innocence. We cannot attribute too much weight to what the defendant did or did not do at this juncture.

From a careful reading of the record, the defendant may be guilty. On the other hand, he may be innocent. Some bits of evidence indicate one, some the other, but those bits of evidence indicating guilt do not meet the requirements heretofore defined.

Therefore, under the facts of the record, the cold neutrality of impartial justice dictates that we affirm the action of the Court of Criminal Appeals in remanding this case for a new trial.

DYER, CHIEF JUSTICE, and CRESON and McCANLESS, JUSTICES, concur.

McAMIS, SPECIAL JUSTICE, not participating.