STATE of Tennessee, Appellee,

v.

**Roger Clayton DAVIS, Appellant.**

Court of Criminal Appeals of Tennessee, at Knoxville.

Dec. 13, 1985.

Permission to Appeal Denied by Supreme Court March 3, 1986.

W.J. Michael Cody, Atty. Gen. & Reporter, Jane W. Young, Asst. Atty. Gen., Nashville, Carroll R. Ross, Asst. Dist. Atty. Gen., Madisonville, for appellee.

Kendred A. White, Madisonville, for appellant.

## OPINION

O'BRIEN, Judge.

██ Roger Clayton Davis was indicted by the Grand Jury of Monroe County for aggravated kidnapping and aggravated rape. The transcript indicates a jury verdict for each of these offenses and defendant was sentenced to imprisonment for twenty (20) years respectively, with the sentences to be served consecutively. We note from the minutes of the court below that the judgment entered by the trial court finds the defendant guilty of rape. The transcript controls. *State v. Zyla*, 628 S.W.2d 39, 42 (Tenn.Cr.App.1981). The judgment is corrected to reflect the verdict of the jury finding defendant guilty of aggravated rape. T.R.A.P. 36(a).

In the first three issues defendant challenges the weight and legal sufficiency of the evidence to support the verdict of the jury. In review the evidence shows that in the early morning hours of June 16, 1982 the victim in this case was abducted from the Pantry Market in Etowah, Tennessee where she was employed as a clerk. She testified she was sweeping the parking area near the gas pumps when a truck pulled up in front of the store. The individual in the truck chased her, grabbed her around the waist and pulled her up by the hair; he then began to choke her and pointed a gun at her head. She was dragged to the truck and thrown inside. As her assailant drove off he held her on the seat by the throat, with her face up. She attempted to talk to him and calm him down but only received short and terse responses. He took her to an unfinished shack located behind property owned by defendant's stepfather where he threw her down on a bed and lighted a candle. He then undressed her, and himself. Standing in front of her he forced her to perform oral sex on him until he achieved an erection. He then had intercourse with her until he ejaculated. After this he dressed himself and tied her hands and feet to the bedpost with wire. When she heard him drive off the victim broke loose and ran naked through the woods until she came to a house where she was able to get help. Her family was contacted and she learned the local police had been searching for her since shortly after her abduction. She was able to describe the direction her assailant had taken from the store, and give a description of the shack and its contents and furnishings. She was taken to a hospital, examined and attended, and then accompanied the officers to the shack where the rape had occurred. Some of the furnishings, including the bed had been removed and the scene altered, but her shirt was found inside the shack along with several articles the victim had described to the police. The bed was found in a nearby trailer. The young lady could not identify the truck she was taken in, but she positively identified defendant from a photographic line-up. She was able to give the police a detailed description including his height, weight, build, and color of his hair, which she described as dark strawberry blonde and shoulder-length. She informed them he was wearing white pants and a dark blue pull-over shirt. She also unwittingly picked out a photo of his brother, saying, that was not the man but his features were similar enough to be a brother of the rapist. She did not notice any scars or tattoos on her assailant, nor did she observe any odor of alcohol on his breath.

Another witness who was acquainted with both defendant and his brother, testified that she had seen him about 8:00 p.m. on the night before the rape took place. At that time he was wearing white pants and a dark pull-over. She described his hair as being dark brown. At the time he was driving his step-father's truck which she described as green-colored. She also testified that the next morning defendant's step-father, who was a deputy sheriff, came in a patrol car to the campground where she and defendant's brother were staying. The brother left with him in the car and an hour or two later came back in the truck. He began cleaning out the truck with the assistance of the group there at the campground. He cleaned out both the bed and the cab of the truck.

Defendant presented proof to show that he had been drinking beer with a friend until about 2:00 a.m. on June 16th. That his hair was dyed black, and that he had several tattoos on his body, two of which are prominently displayed on the front thigh of each leg. He also had a six-inch scar running downwards from his navel.

A jury verdict, approved by the trial judge, resolves all conflicts in the witness' testimony in favor of the State's theory. *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). Where the sufficiency of the evidence is challenged, the relevant question for the appellate court is whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); T.R. A.P. 13(e). The evidence in this case meets that requirement.

■ Defendant contends the trial court erred in refusing to allow him to exhibit the tattoos on his thighs to the jury. He raises the same issue in reference to the scar on his abdomen. He was allowed to exhibit his upper torso showing the various tattoos about that part of his body to the jury. The trial judge would not allow him to exhibit his thighs and lower abdomen. Photographs of these areas of his body were admitted into evidence. The photographs of his scar and the tattoos on his thighs are clear and accurate representations of the actual physical evidence. Defendant argues that the two tattoos were paramount to his defense and photographs did not give an in depth view of them or of the scar. He also says the photographs were not the best evidence for the jury's consideration. The best evidence rule applies only to documentary proof and not to physical evidence. *Boshears v. State*, 500 S.W.2d 621, 624 (Tenn.Cr.App. 1973). There was never any dispute about the fact that defendant had an abdominal scar and tattoos on his legs. The victim simply said she was too frightened at the time to notice whether he had any moles, scars, cuts or anything else about his person. This created an issue for the jury. We find no abuse of discretion in the trial court's refusal to allow the defendant to expose his lower extremities in court.

■ Defendant has raised an issue pertaining to admission of evidence of another crime. His contention is that the two offenses must be substantially identical and be unique in order to be evidence of defendant's identity as the offender in the case.

In *Bunch v. State*, 605 S.W.2d 227 (Tenn. 1980), the Supreme Court reiterated the mandatory criteria for admission of evidence that a defendant has committed some other crime wholly independent of that for which he is charged. Even if it is an offense of the same character, it is usually not admissible because it is irrelevant, *Bunch* at 229. The court emphasized, that because of the obvious prejudice of such evidence to the defendant its admission often constitutes prejudicial error requiring reversal of the conviction, citing *Gray v. State*, 191 Tenn. 526, 235 S.W.2d 20 (1950). Evidence that a defendant had committed a separate and distinct offense from the one on trial must be relevant to some matter actually in issue in the case on trial, and to be admissible its probative value as evidence of such matter in issue

must not be outweighed by its prejudicial effect upon the defendant.

Evidence of the separate offense in this case was admitted on the issue of identity which was sharply contested. There was a pervasive effort throughout the trial to establish that the victim was confused by the remarkable similarity in resemblance between defendant and his brother. However the court said in *Bunch* at page 230 "When evidence that the defendant committed another crime is offered to prove his identity as the perpetrator of the crime on trial, the *modus operandi* of the other crime and of the crime on trial must be substantially identical *and must be so unique* that proof that the defendant committed the other offense fairly tends to establish that he also committed the offense with which he is charged," (emphasis in original text). Citing from *United States v. Powell*, 587 F.2d 443 (9th Cir. 1978), the Court said:

"The probative value of evidence of other crimes where the issue is identity depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense in issue. Both the existence and the strength of an inference proceeds through an evaluation of the similarities between the prior offense and the charged crime. Thus, if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise. An inference of identity from prior crimes can only arise when the elements of the prior offense and the charged offense, singly or together, are sufficiently distinctive to warrant an inference that the person who committed the prior offenses also committed the offense on trial.... The probative value of evidence of other crimes on the issue of identity always depends upon the strength of the inference; when the inference of identity is weak, evidence of prior crimes should be excluded because under such circumstances the prejudicial

effect of the evidence inevitably outweighs the probative value of that evidence." 587 F.2d at 448.

The court also commented that perhaps the best expression of this requirement found in our own cases is that by Judge Tatum in *Young v. State*, 566 S.W.2d 895 (Tenn.Cr.App.1978). In *Young* this Court, citing from *Wrather v. State*, 179 Tenn. 666, 169 S.W.2d 854 (1943) said, "[T]he proof depended on to show that two crimes were committed by the same person must establish some peculiarity or plan or a unique method common to the two offenses, otherwise, evidence showing the defendant guilty of a collateral crime could do no more than indicate an evil propensity."

We have discussed at length the elements of the offense in this case. The facts and circumstances of the other offense which was introduced into evidence by the State to prove defendant's identity was through the testimony of the young lady victim of rape in the State of Florida. Defendant had testified he had been convicted of false imprisonment and escape from the State of Florida in 1980. The State brought the victim in that case to testify in rebuttal. After a jury-out hearing the trial judge ruled the testimony would be admitted on the issue of identity. In doing so he commented that whether or not the victim's description of the defendant was accurate or reasonable under the circumstances of the particular lighting available in the room as well as other circumstances of this case made the question of identity more important. The circumstances referred to were the failure of the victim to see the tattoos and the scar on defendant's body. He noted the presence of a vasoline jar in both cases and that the assailant had grabbed the victim by the hair in each occurrence, and remarked the most compelling reason for the admission of the testimony was the lack of erection in each case until the victim had been required to perform oral sex.

The testimony of the witness in the prior offense was that in 1980 she had been raped by this defendant in Brevard County, Florida. She had been riding her bicycle when a car ran her down from behind. She was knocked off the cycle and was scraped and bruised. The driver of the vehicle approached, grabbed her around the neck and by the hair, and pulled and pushed her into the car. He held her by her hair, face down, on the front seat so she could not see anything. He drove her to a deserted area which she discovered was an abandoned real estate development where the streets had been laid out by the developer. The streets were a maze and there were no visible houses or buildings. She endeavored to carry on a conversation with her abductor but received only curt and short answers in reply. He told her to undress, began kissing her breast, then forced her to perform oral sex on him. He did not attain an erection until the oral sex act. Then he raped her vaginally, but failed to ejaculate. He again forced her to participate in oral sex until he got an erection and then tried to rape her anally. There was a jar of vasoline on the dashboard which she used to ease the pain. He still failed to ejaculate. He allowed her to get up, they engaged in conversation for a period of time during which she tried to prevail on him to let her go. It was still daylight when he drove her to another secluded area. He said he would take her back to her dormitory after it was dark. He then told her to take all her clothes off again. When she complied he forced her to engage in another act of oral sex which stimulated an erection. He once more assaulted her vaginally, this time he succeeded in ejaculating. He then drove her to her dormitory and left her. During the course of these activities she observed a scar in his navel area. She did not see any other identifying markings on him.[1]

There was little or no uniqueness of methods in these two crimes, although both victims were young, blonde women who were abducted and raped. There was no great similarity in the manner in which these separate events occurred. The first occurred more than four years before in broad daylight. The unarmed assailant held her face down on the car seat in a position from which she could not see as he drove her to an isolated area where the sexual assault took place. He assaulted her both vaginally and anally after requiring her to engage in oral sex before he attained an erection. After completion of the act he drove her home. In the case under consideration the victim was abducted in the small hours of the morning, her head was held face upward in the assailant's lap and she was taken to the shack where the assault took place. The armed kidnapper tried to remove some of her clothing and began fondling her breast while they were enroute. He tried to put his hands inside her pants. When they arrived at the shack he undressed her and undressed himself. When he had completed the assault he tied her to the bed and temporarily left her. Apparently he returned but by that time she had escaped. The only similarity of any consequence was the presence of a jar of vasoline in both cases. He did not use this substance in any fashion. There was nothing so unique about the method of commission of the two crimes as to stamp them as the work of the same individual. We are of the opinion that the prejudicial effect of the admission of the evidence of the first crime outweighed its probative value in this particular case.

For the reasons stated, the judgment of the Criminal Court is reversed and the case is remanded for a new trial.

DUNCAN and CORNELIUS, JJ., concur.

---

1. Defendant testified he acquired the tattoos in prison after this incident occurred.