# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### APRIL 1999 SESSION



**FILED**

**July 15, 1999**

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | C.C.A. No. 01C01-9802-CC-00068 |
| | ) | |
| vs. | ) | Robertson County |
| | ) | |
| **LESLIE BRIAN WILLIS,** | ) | Hon. Robert W. Wedemeyer, Judge |
| | ) | |
| Appellant. | ) | (Felony Murder) |
| | ) | |

FOR THE APPELLANT:

**MICHAEL R. JONES**
District Public Defender
110 Sixth Ave. West
Springfield, TN  37172

**WILLIAM UNDERHILL**
Attorney at Law
512 S. Main St.
Springfield, TN  37172

FOR THE APPELLEE:

**PAUL G. SUMMERS**
Attorney General & Reporter

**KIM R. HELPER**
Assistant Attorney General
425 Fifth Ave. N., 2d Floor
Nashville, TN  37243-0493

**JOHN WESLEY CARNEY, JR.**
District Attorney General

**ARTHUR F. BEIBER**
**B. DENT MORRISS**
Asst. District Attorneys General
204 Franklin St., Ste. 200
Clarksville, TN  37040-3420

OPINION FILED:_____

**REVERSED & REMANDED**

**JAMES CURWOOD WITT, JR., JUDGE**

## OPINION

The defendant, Leslie Brian Willis, appeals from his conviction of felony murder committed during the perpetration of attempted rape of Jamie Marable. The defendant received his conviction at the conclusion of a jury trial in the Robertson County Criminal Court. The same jury acquitted the defendant of premeditated first degree murder. The defendant is presently serving a life sentence in the Department of Correction. In this appeal, Willis raises numerous issues for our review:

1. Whether the trial court improperly allowed evidence that Willis had raped another woman in order to prove his intent to commit attempted rape of the victim.

2. Whether the trial court should have granted his motion for judgment of acquittal on Count 1, felony murder.

3. Whether the evidence sufficiently supports a finding of guilt beyond a reasonable doubt of felony murder.

4. Whether the trial court should have granted a mistrial based upon various allegations of prosecutorial misconduct.

5. Whether the trial court should have granted the defense a continuance because the state failed to provide discovery information pertaining to two potential witnesses.

6. Whether the trial court improperly admitted photographs of the victim's body in the location where it was discovered.

7. Whether the trial court should have excluded the testimony of an expert witness from the FBI based upon the state's failure to provide the defense with the witness' written report.

8. Whether the trial court should have excluded testimony of a TBI agent that Willis threatened to snap his neck, that Willis was shaking and trembling when he was shown a screwdriver the agent believed to be the murder weapon, and that Willis "lawyered up" during interrogation.[1]

Having reviewed the record, the briefs and the oral arguments of the parties, and

_____

[1]Our discussion of the issues in this opinion is in a different order than their presentation in the parties' briefs.

the law, we reverse Willis' felony murder conviction due to insufficient evidence of the underlying felony of attempted rape and remand for a new trial on the lesser offense of second degree murder.

The state presented evidence at trial[2] that on September 8, 1990, 19-year-old Jamie Marable embarked upon an evening of socializing with friends in various Clarksville bars. At the Golden Jukebox, she encountered Willis, with whom she was previously acquainted. Willis purchased mixed drinks for Marable and a friend. Sometime around midnight, Willis and Marable left the Golden Jukebox to go to another establishment, Joe B.'s. At Joe B.'s, Willis paid the cover charge for both himself and Marable. After fifteen to twenty minutes, the two departed Joe B.'s together and returned to the Golden Jukebox.

Around 2:00 a.m., Marable was outside the Golden Jukebox talking with acquaintances when four women arrived who spoke with Marable. Teresa Carpenter testified that when the defendant pulled out of the parking lot, Marable said, "There goes my ride." Tracey Presley heard Marable express distress that "Brian" left her and announce she was waiting on a ride. Cindy McClure heard Marable say she was waiting on her ride and assumed this was someone named Brian about whom Marable had spoken earlier in the conversation.

Teresa Carpenter went inside the Golden Jukebox for a short period of time. When she returned to the parking lot, she saw Willis' truck pulling out of the parking lot a second time. She could not see whether Marable was in the vehicle;

_____

[2]The evidence is summarized here in the light most favorable to the state. The trial of this case was lengthy. Approximately 40 witnesses testified, and some of the testimony, particularly of the factual witnesses, cannot be reconciled. To the extent that other evidence is relevant to issues on appeal, such evidence is discussed with the issue to which it pertains.

however, she did not see Marable in the parking lot.

The following day, a Sunday, Marable's mother became concerned that her daughter had not come home. She notified law enforcement. That same Sunday morning, William Alley, a farmer whose property straddles the Montgomery and Robertson County borders in the Port Royal area, noticed tire tracks from a full-sized vehicle on his property near an area of road construction. The tire tracks appeared to have come from the direction of Clarksville. Mr. Alley had not seen the tracks the previous day.

On Tuesday evening, Mr. Alley drove by the same site and noticed a foul odor. The following day, he again noticed the odor and decided to investigate, which led him to the discovery of Jamie Marable's decomposing body.

Doctor Gretel Harlan, a forensic pathologist, testified that Jamie Marable died close in time to her disappearance around 2:20 or 2:30 a.m. on September 9, 1990. The cause of death was puncture type stab wounds to the neck and chest. Two of the wounds penetrated the third cervical vertebra, leaving an impression of the murder weapon. The impressions had a distinctive, six-pointed star shape. Doctor Harlan opined that these two stab wounds were an "excellent match" with a size 10 torque screwdriver. Doctor Harlan also testified that when she received the victim's body for examination, the clothing was in the correct locations, including the underwear, although the crop top might have been pulled up slightly.

TBI Agent Steve Scott, whose area of expertise includes tool mark identification, examined the impressions in the victim's vertebra with sizes 10 and 15 torque screwdrivers. He could not definitely conclude that one of the two screwdrivers made the impressions; however, the injury was more consistent with

4

a size 10 than a size 15.

Shortly after the discovery of the victim's body, searches were conducted of the defendant's truck, apartment and room at his parents' home. Among the items recovered from the defendant's apartment was a size 15 torque screwdriver. Likewise, physical evidence was collected from the victim's body and her clothing. The evidence at trial revealed that nylon fibers found on the victim's clothing, including a fiber taken from her panties, was consistent with the microscopic characteristics and optical properties of a carpet standard sample from the defendant's truck.

The officers interviewed the defendant about his interaction with the victim on the night of her death. His statements were, to some extent, contradictory. In pertinent part, in a statement given September 13, 1990, the defendant denied that the victim had accompanied him from the Golden Jukebox to Joe B.'s and back to the Golden Jukebox on September 8. He claimed he had gone home alone around 2:30 a.m. In a statement given September 20, 1990, Willis specifically denied that Marable had been in his truck on the night of her disappearance. Former District Attorney General Patrick McCutchen testified that he interviewed the defendant on March 11, 1993. On that date, Willis acknowledged that Marable had been in his truck on the evening in question.

According to Mike Greenfield, the defendant's employer in September 1990, the defendant had worked at the road construction site near the area where the victim's body was discovered. Greenfield recalled that the job was begun on a Wednesday evening and was completed on a Monday. Although he was not sure of the date, September 10 sounded "reasonable" to him. Furthermore, Greenfield testified that the defendant was allowed to use the shop equipment at Greenfield

5

Trucking, which included various torque screwdrivers.

Crystal Bickford, one of the defendant's neighbors at his Clarksville apartment, testified that the defendant told her in approximately June 1990 that he took all of his girlfriends to Port Royal. Bickford assumed this was where he would take them to "park."

Two witnesses testified that Willis made statements indicating he had killed the victim. Kelly Jenkins, who was Willis' co-worker in 1990, testified that he and Willis were drinking beer together when the subject came up of Willis being a suspect in the Marable murder. Willis told Jenkins that they would never prove anything and get a conviction. Jeff Fletcher, a friend of Willis, testified that he and Willis went riding around to smoke marijuana and drink alcohol in the spring of 1994. He testified that Willis would get agitated and angry when he was drinking, and on that occasion Willis got mad for no reason. Willis told Fletcher that he had killed one and was not scared to kill another. When Fletcher inquired who Willis had killed, Willis responded that he had killed the girl in Clarksville. Willis also told Fletcher he would stab his guts out, too, from which Fletcher inferred that Willis had also stabbed the girl in Clarksville.

Barbara Williams, who worked with Willis' sister Robin in a Piggly Wiggly store, testified that she was present when Peggy Shemwell, the defendant's girlfriend, came into the store in May 1991 to show Robin the ring the defendant gave her. Williams described the ring as gold, with black onyx and a little diamond. When she was shown a photograph of Marable wearing a ring given to her by her grandmother, she said the ring she had seen on Shemwell's hand looked like the one in the photograph. Other evidence established that Marable always wore the black onyx ring, but it was not recovered with her body.

6

To contradict the state's case, the defense offered evidence that Marable had a verbal altercation in the Golden Jukebox parking lot at approximately 2:30 a.m. with a woman who got out of a Pinto station wagon and began yelling and cursing Marable. After this altercation, the witness who had observed it went inside the Golden Jukebox to get a cup of coffee. When she returned seconds later, both the Pinto and Marable were gone.[3] The defense also offered evidence that Marable had been involved with Raven "Snake" Frazier and that Frazier's live-in girlfriend, Brenda Huggins, confronted Marable in the parking lot of the Golden Jukebox on September 8 and threatened to hurt her if the behavior continued.[4] The defense also offered the testimony of Robin Wheeler, the defendant's sister, and Peggy Shemwell to contradict Barbara Williams' testimony that the defendant had given Shemwell a black onyx ring.[5]

At the conclusion of the proof, the jury retired to consider the defendant's guilt of count one, felony murder during the attempt to commit rape, and count two, first degree premeditated murder. After deliberating, the jury returned a verdict of guilty on count one and not guilty on count two. The trial court imposed a life sentence.

---

[3]Apparently, the state effectively diminished the credibility of this witness. The witness testified that TBI Agent Mike Breedlove took her to a residence to see a Pinto station wagon, which she identified as the one she had seen. Agent Breedlove testified that he had not taken this witness to identify a vehicle.

[4]The state offered evidence that Huggins had confronted Marable, but that it had been on another date at another location. Huggins testified for the state and denied having been in the Golden Jukebox parking lot on September 8. A second individual who the defense alleged had been present with Huggins during the confrontation testified for the state on rebuttal. She admitted being at the Golden Jukebox on the night in question, but she denied being in the parking lot with Huggins, Frazier and Marable.

[5]Shemwell also testified that law enforcement officers had offered her money in exchange for testimony inculpating the defendant. These officers took the stand on rebuttal and denied this allegation.

Against this factual backdrop, the defendant appeals.

# I

First, we consider whether the trial court improperly allowed evidence that Willis had raped another woman in order to prove his intent to commit attempted rape of the victim.[6] The use of this evidence was limited to proof of the underlying felony of attempted rape, which was necessary to support a conviction of felony murder. A discussion of this issue is germane despite our reversal of the felony murder conviction as discussed in section II below because its erroneous admission affects our determination that the case should be remanded for a new trial on the lesser offense of second degree murder.

The evidence in question consists of the testimony of a young woman, S.C.,[7] that she encountered Willis in December 1985. He asked her if she would like to "get high," and she responded affirmatively. She got into Willis' vehicle, and the two drove away. The defendant's demeanor changed. When S.C. asked to be taken back to her car, the defendant said "shut up b----." The defendant drove to a secluded location. He ordered S.C. to disrobe and said, "well you've f----- everyone else, so you're going to f--- me now." He forced her at knife point to perform oral sex on him, although he never became aroused. The defendant told S.C. that he could not decide whether to kill her. He said he thought he should kill her because she would talk about the incident. S.C. repeatedly promised she would never reveal anything. He said that if he killed her and dumped the body no one

---

[6]We consider this issue prior to our discussion of the sufficiency of the evidence because an understanding of the trial court's admission of prior bad act evidence pursuant to Rule 404(b) is necessary for an understanding of the sufficiency analysis that follows. See infra, § II.

[7]The victim's name is not relevant to the issue before the court.

would ever connect him to the crime because no one would believe he would be with someone like S.C. The defendant told her that it would be foolish to go to the police because no one would ever believe a slut like her. The defendant said that if he were suspected, his father would take care of it for him.

Eventually, the defendant seemed to tire and took S.C. back to her car. At one point on the return trip, he pushed S.C. down in the seat so she would not be seen by some people they passed.

As a general proposition, evidence of a defendant's prior crimes, wrongs or acts is not admissible to prove that he committed the crime in question. Tenn. R. Evid. 404. The rationale underlying the general rule is that admission of such evidence carries with it the inherent risk of the jury convicting the defendant of a crime based upon his bad character or propensity to commit a crime, rather than the conviction resting upon the strength of the evidence. State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994). The risk is greater when the defendant's prior bad acts are similar to the crime for which the defendant is on trial. Id.; see also State v. McCary, 922 S.W.2d 511, 514 (Tenn. 1996). Nevertheless, evidence of a defendant's prior crimes, wrongs or acts may be admissible where it is probative of material issues other than conduct conforming with a character trait. Tenn. R. Evid. 404(b). In Tennessee, evidence of a criminal defendant's character may become

admissible when it logically tends to prove material issues which have been divided into three categories: (1) the use of "motive and common scheme or plan" to establish identity, (2) to establish the defendant's intent in committing the offense on trial, and (3) to "rebut a claim of mistake or accident if asserted as a defense."

9

McCary, 922 S.W.2d at 514.  In order for such evidence to be admitted, the rule

specifies three prerequisites:

> (1)     The court upon request must hold a hearing outside the jury's presence;
> (2)     The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and,
> (3)     The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid.  404(b).  A fourth prerequisite to admission is that the court find by

clear and convincing evidence that the defendant committed the other crime.  Tenn.

R. Evid. 404, Advisory Comm'n Comment; State v. DuBose, 953 S.W.2d 649, 654

(Tenn. 1997); State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985).

In reviewing a trial court's decision to admit or exclude evidence, an

appellate court may disturb the lower court's ruling only if there has been an abuse

of discretion.  DuBose, 953 S.W.2d at 652; State v. Baker, 785 S.W.2d 132, 134

(Tenn. Crim. App. 1980).  Where  the trial court has been called to pass upon the

admissibility of evidence other crimes, wrongs or acts under Rule 404(b), its

determination is entitled to deference when, as in the case at bar, it has

substantially complied with the procedural requisites of Rule 404(b).  See DuBose,

953 S.W.2d at 652.

In the present case, the trial court specifically ruled that the prior rape evidence

could be admitted as proof on the issue of intent.[8]  In its brief, the state argues that

---

[8]The supreme court has said that "other crime" evidence of a sexual nature is not admissible under Rule 404(b) to prove a defendant's intent in committing various sex crimes, including rape, because intent is not an element of proof of the crimes.  McCary, 922 S.W.2d at 513-14; accord Parton, 699 S.W.2d at 303 (aggravated rape) (prior to enactment of 1989 Criminal Code and adoption of Tennessee Rules  of Evidence); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987) (same as Parton).  On the other hand, this case involves an alleged *attempted* rape, and intent *is* an element of criminal attempt.  See State v. Kimbrough, 924 S.W.2d 888, 890 (Tenn. 1996).

10

S.C.'s testimony "was relevant to Willis' intent in driving off with Jamie Marable from the Golden Jukebox in September 1990 to a location known as a parking or party spot." However, the state's argument is diminished by the fact that this is not a case where intent is suggested by some logical progression between the two cases. See, e.g., State v. Paul Carr Moss, Jr., No. 01C01-9803-CC-00118, slip op. at 18-19 (Tenn. Crim. App., Nashville, June 1, 1999) (approving use of evidence of sexual contact between defendant and his minor daughter in order to demonstrate defendant's intent in killing wife so as to regain access to the daughter); State v. Hayes, 899 S.W.2d 175 (Tenn. Crim. App. 1995) (approving use of the defendant's unindicted acts of kissing daughter-victim in order to show element of intentional touching of victim's breast for purpose of sexual arousal or gratification). Here, the state asked the jury to believe that the defendant intended to rape the victim because five years earlier he raped a female victim in Kentucky. There is no logical progression nor any cause-and-effect relationship, only the extrapolation that, if the defendant intended rape of a female in 1985, he must be the sort of person who intended to rape Jamie Marable. Propensity evidence by any other name is still propensity evidence, and evidence that is propensity evidence only is inadmissible. Tenn. R. Evid. 404(a), (b); see also Tenn. Rule Evid. 404(b)(2) (character evidence must be relevant to a material issue "other than conduct conforming with a character trait"). The prior rape has no connection to the present case without applying the convention "if he did it before, he probably did it this time." The character trait provides the basis for inferring intent.

Even though the trial court did not rely upon nor did the state argue identity as an alternative basis for admission of the evidence, we have examined identity because the killer's intent to rape is only meaningful if the identity of the killer is established. With identity at issue, prior-crime proof that pointed to the *defendant* in order to show the *defendant's* intent also served to implicate the

11

defendant as the perpetrator. Under a common scheme or plan theory, identity may be suggested through proof of crimes with similar, but distinctive features. McCary, 922 S.W.2d at 514. Indeed, in the present case, both crimes involved a young woman being transported to a remote location. In 1985, the defendant threatened his victim with a knife, and in 1990, Jamie Marable was stabbed to death with a screwdriver.

However, the problem with recognizing and using identity as a basis for admitting the prior rape evidence in the present case is that the similarities between the two incidents are very meager. In State v. Davis, 706 S.W.2d 96 (Tenn. Crim. App. 1985), the defendant was convicted of raping a young blonde female. Because his identity as the rapist was at issue, the state utilized evidence that Davis committed a previous rape of a young blonde female in Florida. Id. at 99-100. In each case, the perpetrator abducted the victim by grabbing her hair and forcing her into his vehicle, and then he drove her to a remote location where vaginal rape, at least, was preceded by the rapist forcing the victim to perform fellatio to facilitate his erection. See id. Each victim testified that she saw a jar of Vaseline in the vehicle in which she was abducted. Id. Despite these similarities, this court held, "[T]here was nothing so unique about the method of commission of the two crimes as to stamp them as the work of the same individual." Id. at 100. The admission of the evidence of the prior rape was reversible error. Id. *A fortiori*, there are no distinctive features about the two incidents in the present case which would "stamp them as the work of the same individual."[9] Id.

_____

[9]When the state advances the use of evidence of a prior crime committed by the defendant that is similar in nature to the crime on trial and yet there are no similarities of "distinctive" methods shared by the two crimes, see Davis, 706 S.W.2d at 99, the error is exacerbated because the similar *nature* of the crimes only heightens the prejudice to the defendant on trial. See Rickman, 876 S.W.2d at 828; McCary, 922 S.W.2d at 514.

12

The evidence of the 1985 rape was inadmissible because it essentially was probative of no material issue other than showing the defendant acted "in conformity with the character trait." Tenn. R. Evid. 404(b). Additionally, the danger of unfair prejudice was substantial. See id. The narration of the rape incident was highly prejudicial in and of itself, and this prejudice was only exacerbated in the 1985 victim's narration of the defendant's post-rape comments in which he mulled whether to kill the 1985 victim. This part of the evidence is not relevant to the defendant's asserted proclivity to rape and needlessly increased the prejudicial effect of the testimony.

For all of the above reasons, we conclude that the trial court erred when it admitted the evidence of the prior rape. The question which remains is what effect the erroneous admission of this evidence had on the jury. The extremely prejudicial character of this evidence coupled with the jury's finding of guilt of felony murder despite legally insufficient evidence of attempted rape, as discussed in section II below, leads us to conclude that the error more probably than not affected the verdict. See Tenn. R. App. P. 36(b); cf. State v. Ron Puglisi, No. 01C01-9205-CC-00166 (Tenn. Crim. App., Nashville, July 21, 1994) (admission of sexually oriented material for purpose of demonstrating defendant's intent to commit aggravated sexual battery was reversible error). As such, the defendant should receive a new trial on the lesser offense of second degree murder[10] at which this evidence is excluded. Accord State v. Bordis, 905 S.W.2d 214 (Tenn. Crim. App. 1995) (remand for new trial on lesser grade offense where evidence insufficient to support conviction of greater offense and prejudicial trial error committed).

**II**

---

[10]See *infra*, § II.

13

We move next to consideration of two related issues, whether the trial court should have granted the motion for judgment of acquittal and whether the evidence is sufficient to sustain the defendant's conviction of felony murder.

A motion for judgment of acquittal is a question of the sufficiency of the state's evidence of the defendant's guilt of the crime charged. State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). Accordingly, the standard for determining whether a motion for judgment of acquittal should be granted is analogous to the standard employed in reviewing the sufficiency of the convicting evidence after a conviction has been imposed. See State v. Jerry Burke, No. 02C01-9510-CR-00319, slip op. at 10-11 (Tenn. Crim. App., Jackson, Dec. 12, 1996), perm. app. denied (Tenn. 1997); State v. Adams, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995).

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

Moreover, a criminal offense may be established exclusively by circumstantial evidence. Duchac v. State, 505 S.W.2d 237 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d 608 (Tenn. Crim. App. 1987). However, before an accused may be convicted of a

criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971); Jones, 901 S.W.2d at 396. In other words, "[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." Crawford, 470 S.W.2d at 613; State v. McAfee, 737 S.W.2d 304, 305 (Tenn. Crim. App. 1987).

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); Farmer v. State, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. Cabbage, 571 S.W.2d at 835.

On the date the victim was killed, first degree felony murder was defined as "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy[.]" Tenn. Code Ann. § 39-13-202(a)(2) (1991) (amended 1995).

On the relevant date, the definition of rape included "unlawful sexual

15

penetration of a victim by the defendant or of the defendant by a victim . . . [where] [f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1) (1997).[11]  With respect to criminal attempt, the Code provides

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
> (1)     Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;
> (2)     Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
> (3)     Acts with the intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3) (1997).

In the light most favorable to the state, there is sufficient circumstantial evidence that Willis knowingly killed the victim.  The victim referred to the defendant as her "ride."  She had been in the parking lot of the Golden Jukebox around 2:30 a.m., and after the defendant's truck was seen leaving the parking lot, the victim was not seen again.  The victim's body was found in a remote location near the defendant's worksite.  Moreover, the worksite was in the Port Royal area, where the defendant had told a neighbor he took all his girlfriends.  Tire tracks from a full-size vehicle were seen in this location the morning after the victim's disappearance, and the defendant drove a Chevrolet Silverado pickup truck.  The defendant had access

---

[11]The trial court instructed the jury that rape could be accomplished by force and coercion.  The court also included as an alternative means of committing the crime "that the sexual penetration was accomplished without the consent of the alleged victim and the defendant knew, or had reason to know, at the time of the penetration that the alleged victim did not consent."  The latter means of committing the crime was not added to the rape statute until 1995, several years after the victim's death.  See Tenn. Code Ann. § 39-13-503(a)(2) (1997); see also Tenn. Pub. Acts 1995, ch. 484, § 3.  Because, for the reasons discussed below, we find the proof of an attempted rape insufficient to support a conviction of felony murder, it is not necessary for us to determine whether the erroneous instruction was prejudicial.

to torque screwdrivers. Initially, the defendant was untruthful with investigators about whether the victim had been in his truck on the night of her disappearance; however, later he admitted she had been in the truck. The defendant made statements to acquaintances indicating he had killed the victim. His girlfriend was seen wearing a ring like the victim's that had not been recovered from the victim's body. The girlfriend was overheard telling the defendant's sister that the ring had been a gift from the defendant.

However, even in the light most favorable to the state, there is insufficient evidence that the defendant recklessly killed the victim *in the attempt to perpetrate a rape*. The state offered proof that carpet fibers were found on the victim's clothing, including a fiber found on her panties. These fibers were consistent with the carpet in the defendant's truck. There was evidence the victim's shoes were removed, her denim mini skirt had a horizontal wrinkling pattern and her crop top was at least somewhat out of place. There was no forensic proof of an attempted sexual assault; in fact, there was, at best, minimal evidence from which the occurrence of a struggle might be inferred.

In our review of the evidence in the light most favorable to the state, we have not overlooked the evidence that the defendant committed a rape in his vehicle in 1985, even though we have concluded in section I of this opinion that such evidence was erroneously admitted. See State v. Longstreet, 619 S.W.2d 97, 100-01 (Tenn. 1981); State v. Bernard T. Anderson, No. 02C01-9710-CR-00394, slip op. at 22 (Tenn. Crim. App., Jackson, Apr. 23, 1999). As noted above, the facts and circumstances of a case built entirely upon circumstantial evidence "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." Crawford, 225 Tenn. at 484, 470 S.W.2d at 613; Jones, 901 S.W.2d at 396. The proof presented at trial, even giving the state the benefit of the

17

improperly admitted evidence, fails to rise to that level.[12]  The evidence supports a logical inference that the defendant attempted to rape the victim before killing her. Equally, the evidence supports a logical inference that there was no sexual encounter at all.  What the evidence does not support is an inference of the defendant's guilt beyond a reasonable doubt, to the exclusion of every other reasonable hypothesis. Thus, the felony murder conviction, based upon a reckless killing in the attempt to perpetrate a rape, cannot stand.

The question of whether the evidence was sufficient to support a verdict of guilt of premeditated murder is beyond our realm because the jury acquitted the defendant of that charge.  However, we may consider whether the evidence is sufficient to support a conviction of second degree murder as a lesser offense of first degree felony murder.  In that regard, we find the evidence sufficient

_____

[12]Initially, the question of how to utilize the improperly admitted evidence in evaluating the sufficiency of the evidence appears to hinge on the question of whether the evidence is relevant.  Prior misconduct evidence that suggests the defendant had a propensity to commit the offense on trial has been characterized as irrelevant. See, e.g., Rickman, 876 S.W.2d at 827 ("evidence that the defendant had committed some other crime wholly independent of that for which he is charged, even though it is a crime of the same character, is usually not admissible *because it is irrelevant*") (quoting Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980)) (emphasis in Bunch); State v. Tizard, 897 S.W.2d 732, 744 Tenn. Crim. App. 1994) (in sexual battery prosecution evidence of defendant's possession of pornographic materials which depicted sexual acts similar to the acts for which the defendant was on trial held to be "not rationally related to the issue of the defendant's criminal intent"); State v. Dies, 829 S.W.2d 706, 709 (Tenn. Crim. App. 1991) ("evidence of other crimes is irrelevant and inadmissible").  To the contrary, other authorities have seen relevance in evidence of this nature. See Otis v. Cambridge Mut. Fire Ins., 850 S.W.2d 439, 442 (Tenn. 1992) (frequent rejection of inquiry into character not due to irrelevance, but to likelihood of jury's over reliance on this evidence); Neil P. Cohen, *et al.*, Tennessee Law of Evidence 161-62 (3d ed. 1995) ("Evidence of a person's character can be helpful to a trier of fact.  If someone has the character "of a thief," the trier of fact could use this to determine whether the person shoplifted on a certain afternoon."); Robert Banks, Jr. & Melissa Maravich, Relevance:  The Tennessee Balancing Act, 57 Tenn. L. Rev. 33, 41-42 (1989) (policy underlying Tenn. R. Evid. 404 is not that character evidence is precluded based upon relevance, but that such evidence results in jury prejudicing defendant on the charged offense because of his bad character).  However, resolution of the tension between these opposing viewpoints is not necessary in the case at bar because appraisal of all of the evidence, including the evidence of the prior rape, fails to exclude every possibility other than the guilt of the defendant.

to support a finding of the defendant's guilt beyond a reasonable doubt.

Often this court will modify a conviction of a greater offense of which the evidence is insufficient to a lesser offense of which the evidence is sufficient. See, e.g., State v. George Blake Kelly, No. 01C01-9610-CC-00448 (Tenn. Crim. App., Nashville, Oct. 13, 1998) (second degree murder conviction dismissed for insufficient evidence and lesser grade conviction of vehicular homicide imposed). The present case is complicated, however, by the erroneous admission of highly prejudicial prior bad act evidence as discussed above. In addition, although second degree murder is a lesser grade of felony murder, it would require a finding of a knowing killing, whereas the jury here, under the then applicable felony murder statute, found the defendant guilty of a reckless killing. We believe the better course is to reverse the defendant's conviction of felony murder and remand for a

new trial on the lesser offense of second degree murder.  Accord Bordis, 905 S.W.2d 214.

## III

Next, Willis claims that the trial court improperly admitted photographs of the crime scene.  Generally, these four photographs[13] depict the decaying body of the victim in the brushy location where it was discovered.  Willis argues that these photographs do not show the position of the body at the time of the crime, demonstrate the circumstances surrounding the offense, or illustrate the struggle of the victim or the ferocity of the attack.  Rather, he claims, their sole value to the prosecution was to inflame the jury.  On the other hand, the state defends the trial court's admission of these photographs as probative of (1) the time of death as demonstrated by the level of decomposition present and (2) whether an attempted rape occurred as demonstrated by the positioning of the victim's clothing.

Technically, consideration of this issue has been pretermitted by our finding that the evidence was insufficient to support the defendant's conviction of felony murder.  However, because there will be a new trial on second degree murder, we take this opportunity to address the guidelines for admission of crime scene photographs.

In determining whether photographs should be admitted, the trial court must determine, first, whether the photograph is relevant.  State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); Tenn. R. Evid. 401.  "'Relevant evidence' means any evidence having any tendency to make the existence of any fact that is of

---

[13]The defendant complains of exhibits 5a, 5b, 5c, 5d and 5e; however, the record on appeal contains no exhibit 5e.

consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. If the trial court deems the photograph to be relevant, it may then allow its admission if its probative value is not "substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. In this regard, photographic depictions of murder victims carry the danger of inherent prejudice. See Banks, 564 S.W.2d at 951. In order to assess the prejudicial effect of the admission of such photographs, the supreme court has said the trial judge is to consider

> the value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

Id. On appeal, a trial court's decision to admit a photographic exhibit is reviewable for abuse of discretion. Id. at 949.

The photographs in question are unpleasant. They show evidence of decomposition of the body. There is also evidence of significant entomological activity. Three of the photographs are not clearly focused, so their unpleasant character is diminished. The more focused photograph shows the victim's body from the waist down. Decomposition, entomological activity, and possible animal activity affected the medical examiner's ability to render opinions regarding the condition of the body at the time of death as well as her ability to estimate the time of death itself. The time of death was particularly relevant to the question of the defendant's guilt of the victim's murder. These photographs serve to illustrate the condition of the body with precision and corroborate the testimony of the medical examiner. See State v. Zirkle, 910 S.W.2d 874, 888-89 (Tenn. Crim. App. 1995) (photograph admitted to corroborate other evidence); State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994) (photograph of corpse admitted to illustrate

21

testimony).  The photographs demonstrate the location of the victim's clothing.  The state offered testimony that the victim's crop top was slightly out of place and her shoes were missing.  The photographs define the condition of the victim's clothing with much more precision than the spoken word.  They were properly admitted.  If the state seeks to introduce these or similar photographs at the defendant's retrial on second degree murder, the trial court will be obliged to renew its inquiry in accord with these principles.


## IV

Next, Willis challenges the propriety of Agent Breedlove's testimony that Willis threatened to snap his neck, that Willis was shaking and trembling when he was shown a screwdriver the agent believed to be the murder weapon, and that Willis "lawyered up" during interrogation.  We address these issues to provide guidance on remand.

The first portion of this testimony relates to the defendant's statement to then-District Attorney General Patrick McCutchen and an encounter the defendant had with Agent Breedlove outside the defendant's apartment complex.  The gist of the complaint appears to be that the state elicited testimony from Agent Breedlove that he surreptitiously observed an interview between Willis and General McCutchen via hidden camera.  Agent Breedlove testified that during the course of the interview, Willis recounted a previous conversation between himself and Breedlove in which Breedlove asked Willis how he killed the victim.  According to Breedlove, Willis said "he wouldn't have done it that way, he would have taken me and if he wanted to kill me, he would have taken me and snapped my neck."  This testimony led the prosecution to ask Agent Breedlove about a heated verbal confrontation between the defendant and himself, a high point of which was the defendant's exhortation to Breedlove that "he was going to break [his] f------ neck

22

. . . ."

The admission of the "snapped neck" statement was not raised in the motion for new trial. Hence, appellate review has been waived. Tenn. R. App. P. 3(e) ("no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in the motion for a new trial; otherwise such issues will be treated as waived"). For purposes of retrial, however, we note the evidence is relevant as a portion of the defendant's prior statements to law enforcement officers. The defendant was advised of his rights before he made the statement to General McCutchen in which he recalled the earlier conversation with Agent Breedlove. We disagree with the defendant's characterization of the "snapped neck" statement as a threat and view it as an abstract statement of how the defendant would kill someone if he were so inclined. The statement was properly admitted and was not unfairly prejudicial. See Tenn. R. Evid. 401, 403, 803(1.2).

On the other hand, there can be no doubt that the statement the defendant made outside his apartment complex was a direct threat to Agent Breedlove's physical well-being. In Tillery v. State, 565 S.W.2d 509, 511 (Tenn. Crim. App. 1978), this court held, "[a]ny attempt by an accused to conceal or destroy evidence, including an attempt to suppress the testimony of a witness, is relevant as a circumstance from which guilt of the accused may be inferred." In Tillery, the defendant threatened an eyewitness several months after the crime. Id. at 510. Although Tillery does not present precisely the same factual scenario, we believe it is sufficiently analogous to lend support to the case at bar. Here, the defendant knew he was the subject of an on-going investigation. Agent Breedlove left his business card with a note indicating his desire to talk to the defendant on the defendant's windshield. Later the same day the defendant saw Agent Breedlove

23

and motioned for him to step out of his car. The defendant then initiated a verbal assault which included the threat to break the agent's neck. Obviously, the defendant's goal was to intimidate, if not physically harm, a law enforcement officer whom he knew was investigating his involvement in the victim's death. Accordingly, we believe this evidence was circumstantially probative of the defendant's guilt. Furthermore, we find greater probative value in this evidence than prejudicial effect. See Tenn. R. Evid. 403. Thus, there was no error in its admission.

Willis also alleges error in Agent Breedlove's testimony that when he confronted the defendant with a torque screwdriver and told the defendant that he knew what had been used to kill the victim, Willis began shaking and trembling. Willis claims this evidence should not have been admitted absent expert testimony that there was a connection between nervousness and guilt. We disagree. This court has recently held that a trial court did not abuse its discretion in allowing a law enforcement officer to testify about personal observations of a defendant's demeanor during the taking of the defendant's statements and that such observations may be of assistance to the jury "in determining the weight and credibility of the defendant's statements." State v. James Clayton Young, Jr., No. 01C01-9605-CC-00208, slip op. at 49 (Tenn. Crim. App., Nashville, May 22, 1998) ("the defendant 'appeared calm'"). The trial court did not abuse its discretion in admitting this evidence.

24

The third complaint is that when Agent Breedlove held up the torque screwdriver and told the defendant he knew what the murder weapon had been, the defendant "lawyered up, he wanted his lawyer." Immediately upon the agent giving this testimony, the defense objected and the court instructed the jury to disregard the statement.

As the state concedes on appeal, this testimony was inappropriate. We recognize that the prosecution may present evidence that an accused terminated questioning at some point after being advised of his Miranda rights and initially electing not to exercise his rights. See, e.g., Ware v. State, 565 S.W.2d 906, 908 (Tenn. Crim. App. 1978). It is apparent, however, that Agent Breedlove's characterization of the defendant's invocation of his right to counsel as lawyering up was an inflammatory denigration of the exercise of constitutional rights. On retrial, the state should insure that this witness does not testify in this inflammatory and improper manner.

**V**

In the remaining issues, Willis questions whether prosecutorial misconduct required a mistrial, whether a continuance was in order when the state failed to provide information regarding two potential lay witnesses, and whether an expert's testimony should have been excluded because the state did not provide the expert's written report prior to trial.

Some of the errors of which the defendant complains hinge on discovery matters. Although the state was tardy in providing some discovery information and other information which should have been provided was misplaced by the state, it appears that the defense has received the statements which were not misplaced and has heard the testimony of the any witnesses whose statements

25

were misplaced.  The defense should be able to proceed with full information and have proper time for investigation upon retrial.  Accordingly, it is not necessary that we consider the issues which pertain to undisclosed discovery materials.[14]

The remaining allegations require brief analysis.

First, the defense attacks evidentiary admissions; however, he does this under the heading of prosecutorial misconduct and does not explain why admission was error under the rules of evidence.  Without some citation demonstrating that the evidence should not have been admitted, we are at a loss to understand how the prosecution committed misfeasance in offering the evidence. We decline to speculate in that regard.[15]  See Tenn. R. Ct. Crim. App. 10(b) (issues not supported by citation to authority shall be treated as waived); Tenn. R. App. P. 27(a)(7) (briefs shall contain citation to authority).

---

[14]Specifically, the issues are:
(1)     Whether a mistrial should have been granted due to prosecutorial misconduct:
    (a)     In calling Crystal Bickford to testify without providing her prior statement, which the state knew was lost prior to calling the witness.
    (b)     In failing to provide the statement of Bo Botts and in misleading the defense that Rose Kitchens would be called as a prosecution witness.
(2)     Whether a continuance should have been granted when the state failed to provide discovery information related to Pamela Bissette and Ed Cota.
(3)     Whether the court erred in allowing Kerry Oein to testify when his report had not been provided to the defense.

[15]These evidentiary issues relate to:
(1)     William Alley's testimony that when he saw the tire tracks near the location where the body was found, he thought to himself, "[B]oy he sure got mad when she said no."
(2)     Judy Kennedy's testimony that the defendant told her his friend Bill had pneumonia and Kennedy's testimony that she thought she saw Bill that morning.
(3)     Harold McCarver's testimony that the defendant apologized to him for using him as an alibi.
(4)     Unresponsive answers and opinion testimony of Pat McCutchen.

Additional allegations are made regarding the prosecution's examination of witnesses. Willis claims that one of the prosecutors "testified from the podium that the reward had been withdrawn." The prosecutor asked a witness on redirect examination, "Did you know that the reward had subsequently been withdrawn, did you know that?" The defense objected, and the prosecutor indicated he was not sure whether evidence had been introduced that the reward had been withdrawn. In fact, no such evidence had been received. The court instructed the jury to disregard the question. On retrial, the prosecution should refrain from asking questions which are premised upon facts not in evidence or which mischaracterize the evidence.

The defendant also complains that the prosecutor asked Jimmy Brumfield whether the defendant's girlfriend was "pretty much dog-face ugly." Apparently, the prosecutor was attempting to discredit evidence that Brumfield and the defendant's girlfriend had been intimate, which was relevant to potential bias of Brumfield against the defendant. The state concedes on appeal that "this statement/question was ill-advised." Accordingly, this court expects the prosecution to pursue a more prudent line of questioning on remand.

Finally, because we have already granted the defendant a new trial, it is not necessary that we analyze his claim of cumulative error from his various allegations of prosecutorial misconduct.

In conclusion, the defendant's conviction of felony murder is reversed. This matter is remanded to the Robertson County Criminal Court for a new trial on

the lesser grade offense of second degree murder.

_____
JAMES CURWOOD WITT, JR., JUDGE

CONCUR:

_____
JOHN H. PEAY, JUDGE

_____
DAVID H. WELLES, JUDGE