IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 18, 2002

## STATE OF TENNESSEE v. MYRA S. BIKREV

**Appeal from the Circuit Court for Williamson County**
**No. I-1100-336-B    Donald P. Harris, Judge**

---

**No. M2001-02513-CCA-R3-CD - Filed April 2, 2003**

---

Myra S. Bikrev appeals from her Williamson County convictions of felony theft of property, coercion of a witness, and aggravated perjury. These convictions were imposed following findings of guilt at a jury trial, and Bikrev is presently serving an effective eight-year sentence involving both jail confinement and probation. She challenges the sufficiency of the evidence as well as the propriety of the sentences she received. Her appellate arguments are not meritorious, and we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Diane Crosier, Franklin, Tennessee, for the Appellant, Myra S. Bikrev.

Paul G. Summers, Attorney General & Reporter; Braden H. Boucek, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Lee Dyer, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

These interrelated offenses pertain to the defendant's theft of computer equipment from Brian and Barbra Maislin, the defendant's subsequent threats to Mr. Maislin, and perjurious statements made by the defendant at her husband's preliminary hearing.

*Evidence Related to Theft and Witness Coercion*

In the light most favorable to the state, the evidence at trial established that in July 2000, the Maislins operated a small business, Barb's Computer Works, in which they bought and sold computers and computer peripherals. The Maislins kept their inventory in a unit at a rental storage facility in the Bellevue area of Nashville. The defendant and her husband responded to a newspaper advertisement placed by the Maislins and arranged to meet Mr. Maislin at the storage

facility to discuss purchasing a used computer. Mrs. Maislin was certain that the meeting took place on July 28, while Mr. Maislin testified that it was on July 28 or 29.

At the appointed time, Mr. Maislin was also dealing with another customer at the storage facility, so the Bikrevs told him that they would wait. While Mr. Maislin dealt with this customer, the Bikrevs looked around the facility. When it was their turn to do business with Mr. Maislin, the Bikrevs purchased an older, used computer, monitor, keyboard, and mouse. The defendant told Mr. Maislin that she was going to use the computer for business purposes, yet she declined a receipt and became evasive about giving him her name, address, and telephone number for documentation purposes.

That evening, Mr. Maislin received the first of many telephone calls from the Bikrevs complaining that the monitor they purchased was not functioning properly. Because Mrs. Maislin was more adept at solving technical problems of this nature, Mr. Maislin offered to have her return the Bikrevs' call. However, the Bikrevs declined.

On July 30, the Maislins and their children went to the storage facility and found the door ajar and the hasp hanging with the lock still attached. Many items of inventory were missing, equipment was broken, and the space had been ransacked. The Maislins notified the police. They also reviewed videotape from the security cameras installed at the storage facility. One of the cameras near their storage unit had been turned upwards, and on the video from that camera the Maislins saw a hand grab the camera and move it. On the hand was a very distinctive ring, which Mr. Maislin immediately recognized as one worn by Mr. Bikrev on the day the Bikrevs purchased a computer from him. Likewise, the defendant had worn a matching ring. From watching the videotapes, Mrs. Maislin deduced that the storage unit had been compromised sometime after 10 p.m. on July 29.

On July 31, Mr. Maislin decided to call the Bikrevs to check on the monitor problem they had reported. Their telephone number was on his caller identification, as they had by this point made multiple calls regarding the monitor problem. Mr. Maislin offered that he and his wife would come to the Bikrevs' home in Franklin to fix the monitor, which was actually a ruse by which he planned to look around their home for evidence that they were responsible for the burglary and theft at the storage unit. After initial hesitation, the Bikrevs agreed to allow the Maislins to come to their home that day.

During the Maislins' visit at the Bikrev residence, the defendant was nervous and edgy, especially when the Maislins' children approached a vehicle parked outside. When the Maislins had first arrived, they had been instructed by one of the Bikrevs not to park near this vehicle. The defendant claimed that the children might be harmed by vicious dogs, but there were no dogs in sight, nor were any dogs heard barking. After inspecting the computer monitor and finding it non-operational, Mrs. Maislin offered to open the monitor to determine if a fuse needed replacing, but the Bikrevs were uninterested in having her do so. While inside the Bikrev residence, Mr. Maislin observed a very distinctive box which was identical to one in which some of the stolen

property had been contained in the storage unit. Mr. Maislin again observed the matching, distinctive rings that the defendant and her husband wore.

On August 2, officers from the Williamson County Sheriff's Department and Metro Police Department went to the Bikrev residence. They knocked on the door for several minutes, but no one answered. They did see, however, the blinds being raised. After receiving no answer, they drove to the main road, where they sat for 30 to 40 minutes before returning to the residence and knocking again. This time, the defendant answered the door. She and Mr. Bikrev were both interviewed, and they gave conflicting stories about where they had been on the officers' first arrival. Mr. Bikrev gave written consent for the officers to search the residence, although the search did not result in location of any of the Maislins' stolen property. Part of the residence was locked, and Mr. Bikrev told them officers that someone else lived in that part of the residence.

On August 2, the Maislins received several telephone calls from the Bikrevs in which the Bikrevs inquired what the Maislins' problem was with them. Mr. Maislin responded that he knew what the Bikrevs had done, and it would be handled by the police. During the third such call, the defendant told Mr. Maislin that they knew where his family lived, and he had better watch himself. She also advised him that the authorities were at her residence, but "[t]hey couldn't find a . . . turd in an outhouse and . . . you will never find your s—."

On October 7, 2000, Johnnie Talley, who lives near the house where the Bikrevs lived in July 2000, was operating a bush hog when he discovered several boxes sealed in plastic and duct tape on his property. The boxes were obscured by tall grass. After opening one of the boxes and finding computer equipment, he notified the Williamson County Sheriff's Department. The Sheriff's Department took possession of the boxes.

The Maislins were allowed to inspect the property within a few days and identified the contents of the boxes as being a portion of the equipment that had been stolen from their storage unit in July. All of the items were damp, and some were very wet. After taking the equipment home and allowing it to dry, the Maislins booted the computers. They discovered the defendant's first name, "Myra," listed on the registry, password, and files in two of the computers. One of these two computers also contained a fax coversheet document with the defendant's first and last name, an address, and telephone number. There were numerous files on all three of the recovered computers which where created between July 30 and August 2.

After the property was recovered, both of the Bikrevs were taken into custody. The defendant initially agreed to talk with the authorities and even accused the authorities of harassing her. However, when she was confronted with evidence that a file containing a fax coversheet bearing her name had been found on one of the computers, she became upset. One of the officers testified that "[s]he looked like she was fixing to pass out." The defendant then terminated the interview and requested her attorney.

The defendant did not testify on her own behalf, but her husband testified that after he called Mr. Maislin and reported a problem with the recently purchased computer, Mr. Maislin had cursed him, told him that he had friends in high places, including detectives, that he would make Mr. Bikrev's life miserable, and that Mr. Bikrev would go to jail. Mr. Bikrev claimed that he had filed a police report relative to these threats and that he had played a tape recording of the call for the police. On cross-examination, Mr. Bikrev admitted that he had a felony theft conviction.

A sheriff's deputy testified that he took the report relative to the alleged intimidation, and although he did not recall whether he had listened to a tape, his report stated nothing about a tape, and he seriously doubted that he would not have recorded such, had he listened to a tape containing pertinent evidence. He further testified that he had not taken a tape from Mr. Bikrev, and so far as he knew, no criminal charges were ever initiated as a result of the alleged incident. Mr. Maislin testified that he had never threatened Mr. Bikrev, nor had he ever said to Mr. Bikrev that he had friends in high places.

*Evidence Related to Aggravated Perjury*

On August 10, 2000, officers with the Williamson County Sheriff's Department went to the Bikrev residence to serve an arrest warrant on Mr. Bikrev for an unrelated theft case. Some of the officers approached the door to the residence, and others went to secure any exits. The defendant answered the officers' knock on the door. They attempted to explain to her why they were there, but the defendant acted as if she did not understand and was generally uncooperative. While this was ongoing, several of the officers saw Mr. Bikrev through a window in the residence. He was running toward the back of the house. One of the officers yelled that Mr. Bikrev was running, and an officer standing in close proximity to the defendant heard this clearly. Officers attempted to enter the residence, but the defendant blocked the door and grabbed one of the officers by the arm. After an officer pushed her aside, she continued to obstruct their efforts to take her husband into custody. She was extremely uncooperative and rude. She was asked to remain in one location, and even after the officers had to restrain her with handcuffs, she would not remain seated. Due to her behavior, which was judged potentially threatening to officer safety, she was placed in a patrol car. However, the defendant eventually agreed that she would assist the authorities in taking Mr. Bikrev into custody if she would not be prosecuted for obstructing their earlier efforts to do so. Ultimately, she provided this assistance by notifying them when he returned to the residence.

The jury was informed by stipulation of the parties that the defendant had testified at her husband's subsequent bond hearing that "he never fled from the police."

Through cross-examination of state witnesses, the defense attempted to establish that the defendant could have been unaware of her husband's flight from officers on August 10, inasmuch as she was standing at the door of the house facing toward officers when her husband was running toward the back of the house.

*Trial Court Disposition*

After receiving this evidence, the jury considered the charged offenses of theft of property valued over $1,000, coercion of witness Brian Maislin, and aggravated perjury. After deliberations, the jury found the defendant guilty of each of the three charges.

The trial court then imposed concurrent three-year, Range I, Department of Correction sentences for the theft and coercion of a witness convictions, but it suspended those sentences conditioned upon of service of four years' probation, with the first year to be served in jail at 100 percent. For the aggravated perjury conviction, the court imposed a Department of Correction sentence of three years and six months, suspended conditioned upon four years' probation, with the first 180 days to be served in jail. Because the aggravated perjury offense was committed while the defendant was on bond for the theft and coercion charges, consecutive service of the theft and coercion sentences with the aggravated perjury sentences was ordered.

Following an unsuccessful motion for new trial, the defendant filed this appeal.

**I**

The defendant's first challenge is to the sufficiency of the convicting evidence for each of her three convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1 (Tenn. 2000).

Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id.* at 484, 470 S.W.2d at 613.

In determining the sufficiency of the evidence, this court should not reweigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956);

*Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

## *Theft Conviction*

Theft of property is committed when one "with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103 (1997). In the light most favorable to the state, the circumstantial evidence at trial demonstrated that the defendant and her husband knowingly obtained and exercised control over the Maislins' computer inventory. The defendant and her husband went to the Maislins' storage unit, where they were able to view the inventory. The defendant's husband moved the security camera near the storage unit. Within days, many items of inventory were missing, which were subsequently discovered near the defendant's residence with the defendant's name appearing on files, registration, and passwords on some of the equipment. Shortly after the crime, Mr. Maislin saw an unusual box in the defendant's home that was identical to one in which some of the stolen property had been stored before its theft. *See State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995) ("Possession of recently stolen goods gives rise to an inference that the possessor has stolen them"). Within a few days of the crime, the defendant threatened Mr. Maislin and his family, and she advised him that he would never find his inventory. *See State v. Maddox*, 957 S.W.2d 547, 552 (Tenn. Crim. App. 1997) (evidence that accused attempted to suppress testimony of witness is relevant evidence supporting inference of guilt). From these facts, the jury could, and did, rationally infer that the defendant was guilty of the crime of theft. Because the facts that appear of record are adequate to support the jury's finding, we are not free to disturb the verdict.

## *Coercion of Witness Conviction*

The defendant likewise challenges her conviction for coercion of witness Brian Maislin. The Code defines this crime as follows.

> A person commits an offense who, by means of coercion, influences or attempts to influence a witness or prospective witness in an official proceeding with intent to influence the witness to:
>
> (1)    Testify falsely;
> (2)    Withhold any truthful testimony, truthful information, document or thing; or
> (3)    Elude legal process summoning the witness to testify or supply evidence, or to be absent from an official proceeding to which the witness has been legally summoned.

Tenn. Code Ann. § 39-16-507(a)(1) - (3) (1997).

The defendant maintains that she is not guilty of this crime because there were no charges pending against her, and therefore no "official proceeding," at the time that she telephoned threats to Mr. Maislin. The state concedes that no "official proceeding" was underway at the time. *See* Tenn. Code Ann. § 39-11-106(a)(25) (1997) (defining "official proceeding" as "any type of administrative, executive, legislative or judicial proceeding that may be conducted before a public servant authorized by law to take statements under oath"). Nevertheless, the state contends that although no official proceeding had commenced at the time the defendant phoned her threat to Mr. Maislin, an official proceeding was imminent with Mr. Maislin a prospective witness therein. In factual support of this argument, the state points out that the defendant's call to Mr. Maislin was placed the same day that the authorities visited the defendant's home, and she was obviously attempting to frustrate police pursuit of her as a suspect.

Upon review of the pertinent statute, we are inclined to agree with the state. We choose to read the statute conjunctively, that is, we construe the phrase "prospective witness in an official proceeding" to refer not to separate requirements that there be both a "prospective witness" and "an [ongoing] official proceeding," but to refer to an individual who, at some point after being threatened, might be a witness in an official proceeding concerning the relevant subject matter of the threat, whether or not the proceeding has actually been initiated at the time of the threat. We see no logical reason why the legislature would choose to criminalize threatening a prospective witness in a pending official proceeding while not doing likewise for identical conduct directed toward a prospective witness in an as-yet uninitiated official proceeding.

We have noticed that the coercion of a witness statute appears in part 5 of chapter 16, title 39, dealing with "Interference with Government Operations", and not in part 6, dealing with "Obstruction of Justice." *Compare id.* §§ 39-15-501 through -514 *with* §§ 39-16-601 through -609. This arrangement buttresses our impression that Code section 39-16-507 proscribing the coercion of a witness embraces corrupt activity that may occur *before* a official proceeding commences.

Based upon our interpretation of Code section 39-16-507, we hold that the evidence sufficiently supports the defendant's conviction. She communicated a threat to Mr. Maislin from which it may readily be inferred that she intended to influence him against giving evidence or otherwise withholding truthful information about her theft of his property. Moreover, it is beyond question that police investigation in a case of theft is directed toward culmination in an official proceeding. We therefore reject the defendant's narrow interpretation of the statute and hold that she was properly convicted upon sufficient evidence.

*Aggravated Perjury Conviction*

Finally, the defendant claims that she was wrongfully convicted of aggravated perjury. This crime is characterized by the making of a false material statement under oath with the intent to deceive, where the statement is made in an official proceeding. *See Tenn. Code Ann.* § 39-16-703 (1997). The defendant quibbles with the validity of her conviction because there is no direct proof

that she was aware that her husband fled from the police on August 10. However, the state offered strong circumstantial proof to the contrary.

It is apparent from the record that the defendant not only knew that her husband was attempting to elude capture, but that she actively assisted him by employing obstructive tactics with the officers who were attempting to take Mr. Bikrev into custody. The jury acted within its province in rejecting the defendant's claim of ignorance given evidence that police officers standing near the defendant clearly heard an officer yelling that Mr. Bikrev was fleeing, that the defendant was obstructive with the officers, and that the defendant eventually made a deal with one of the officers to notify him when her husband returned to the house in exchange for an agreement not to prosecute her for her obstructive conduct. The evidence supporting a strong circumstantial case against the defendant, we are not at liberty to reweigh the evidence to the defendant's liking. This conviction is founded upon sufficient evidence.

Thus, all three of the defendant's sufficiency-of-the-evidence challenges must fail.

## II

The remaining issue is the propriety of sentences imposed for the convictions. The defendant's only challenge relative to sentencing is that the probationary portion of her sentences is too lengthy when considering the length of the incarcerative portion of her sentences.[1] For her theft and coercion of a witness convictions, she was sentenced to concurrent three-year terms of incarceration, suspended in favor of four years probation with the first year to be served in jail. For her aggravated perjury conviction, she was sentenced to a three year and six month confinement sentence, suspended in favor of four years' probation, with the first 180 days to be served in jail. The aggravated perjury conviction was imposed consecutively to the theft and coercion convictions, so her effective sentence encompasses an eight-year term.

When there is a challenge to the length, range or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

---

[1]The defendant does not take any issue with the incarcerative portion of her sentences. Indeed, she alleges in her brief that she has already been released from confinement.

In making its sentencing determination, the trial court, after hearing the evidence and arguments, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-210(a), (b) (Supp. 2002); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

Without any appreciable explanation, the defendant summarily argues in her brief that the trial court should have presumed her a favorable candidate for a probationary sentence pursuant to Code section 40-35-102(6) and that the sentence is unreasonably lengthy given her prior record. Technically, the defendant has waived our consideration of this issue by failing to provide an adequate argument supported by relevant authorities in her brief. *See* Tenn. R. App. P. 27(a)(7); Tenn R. Ct. Crim. App. 10(b).

Moreover, the defendant's contentions are substantively without merit. With respect to the trial court's length-of-sentence determination, the defendant, a Range I offender, received sentences at and near the maximum of the two-to-four-year range for her Class D felonies. On appeal, she takes no issue with the trial court's application of enhancement factors relative to (1) her previous record of criminal convictions or behavior, (2) her status as a probationer at the time she committed the theft and coercion offenses, and (3) her status as a releasee on bail at the time she committed the aggravated perjury offense. Tenn. Code Ann. § 40-35-114(2), 14(A), 14(C) (Supp. 2002. She likewise commends no mitigating factors to us in addition to the sole finding by the trial court that her conduct did not cause or threaten serious bodily injury. *Id.* § 40-35-113(1) (1997). Affording the trial court the presumption of correctness in its sentencing determination, we hold that these factors were correctly applied. Moreover, they support the individual length-of-sentence determinations applied by the trial court. It bears noting that the defendant's effective sentence is double what it might otherwise be because she committed the aggravated perjury offense while on bail for the earlier offenses. *See* Tenn. R. Crim. P. 32(c)(3)(C) (mandatory consecutive sentences for defendant who commits a felony while on bail release for committing another felony, and defendant is ultimately convicted of both offenses). The trial court had no discretion to impose the aggravated perjury sentence to run concurrently with the theft and coercion offenses. To this extent, the defendant is the architect of her own misfortune.

The defendant claims the trial court should have afforded her the presumption of favorable candidacy for probation. In fact, she was legally entitled to a presumption of favorable candidacy for *alternative sentencing*, not merely probation, *see* Tenn. Code Ann. § 40-35-102(6) (1997), and the record of the sentencing hearing explicitly reflects that the court afforded her the benefit of that presumption. Having applied the presumption, the court then went on to recount the factual circumstances which reflected upon the defendant's lack of potential for rehabilitation, a relevant consideration in determining the appropriate sentence alternative and length of sentence.

*See id*., § 40-35-103(5) (1997). Specifically, the court found that the defendant exhibited poor rehabilitative potential as demonstrated by her "coercion, threats, fraud, and deceit" once the offenses had occurred. The record likewise reflects that despite her relatively young age of 25 years, the defendant is no neophyte in the criminal justice system, having been previously convicted of two counts of theft, marijuana possession, unlawful drug paraphernalia possession, and resisting arrest. Furthermore, the defendant was on probation at the time of the theft and coercion offenses, thereby demonstrating that a probationary sentence has failed in the past to rehabilitate her conduct to remain within the bounds of the law. All of these factors reflect poorly on the defendant's prospects for rehabilitation. Thus, they demonstrate that a sentence involving both confinement and probation is an appropriate next step in the criminal justice system's continuing efforts to reform the defendant into a law-abiding citizen. The trial court acted appropriately in holding as much.

For these reasons, we affirm the trial court's judgment in each of the defendant's three convictions.

_____
JAMES CURWOOD WITT, JR., JUDGE