# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

## AUGUST 1998 SESSION

FILED

October 19, 1998

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | **C.C.A. NO. 01C01-9708-CC-00352** |
| Appellee, | ) | |
| | ) | **PERRY COUNTY** |
| VS. | ) | |
| | ) | **HON. CORNELIA A. CLARK,** |
| **MARK C. WEATHERLY,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First-Degree Murder; Theft) |

FOR THE APPELLANT:      FOR THE APPELLEE:

**JOHN H. HENDERSON**
Public Defender
   -and-
**VANESSA P. BRYAN**
Asst. Public Defender
P.O. Box 68
Franklin, TN 37065-0068

**JOHN KNOX WALKUP**
Attorney General & Reporter

**LISA A. NAYLOR**
Asst. Attorney General
John Sevier Bldg.
425 Fifth Ave., North
Nashville, TN 37243-0493

**JOE D. BAUGH**
District Attorney General

**DONALD W. SCHWENDIMANN**
Asst. District Attorney General
481 East Main St.
Hohenwald, TN 38462

OPINION FILED:_____

**AFFIRMED**

**JOHN H. PEAY,**
Judge

**O P I N I O N**

Following a jury trial, the defendant was convicted of first-degree murder and theft of property worth five hundred dollars ($500) or less. The trial court sentenced the defendant to life in prison on the murder charge and eleven months and twenty-nine days in county jail for the theft conviction, to run consecutively to the life sentence. The defendant now appeals, arguing that the trial court erred in denying his request for a special jury instruction on circumstantial evidence; that the evidence is insufficient to support convictions for first-degree murder and theft; and that the trial court erred in ordering his sentences to run consecutively. We affirm the defendant's convictions and sentence.

Lynda Cotham Dutton, who was once married to the defendant's now deceased brother, saw the defendant for the first time in six years in a local bar on June 3, 1996. The defendant introduced Lynda to a woman named Mary Margaret Lodge Lee, a woman he said he had "been with" for a few years. At the time, the defendant and Mary were renting a room at a local motel, but neither was employed. Lynda invited the defendant and Mary to live with her. The defendant and Mary moved into Lynda's house that weekend.

Lynda, the defendant, and Mary would regularly socialize together by frequenting a nearby bar called Cub's Den every afternoon. Towards the end of June, a romantic relationship developed between Lynda and the defendant; they were planning to be married on July 21. Lynda and the defendant moved out of the house and in with a friend, Alan Duncan, leaving Mary alone in the house the three had been renting. One evening, while Lynda and the defendant were at Cub's Den, the defendant told a waitress

that "they were going to get rid of" Mary.

Even though Mary no longer joined Lynda and the defendant in their daily visits to Cub's Den, the defendant continued to see Mary on occasion after he and Lynda moved out. On July 3, he borrowed a car from Lynda to drive Mary to pick up her social security check. Later that evening, the defendant and Lynda visited Cub's Den. With a stack of twenty dollar bills, the defendant paid their bar tab and bought "everybody beer."

During the next few days, Mary prepared to move out of the house she had been renting. She told her neighbor, Lisa, that she and the defendant were moving during the weekend of July 7 to a house they had previously viewed, and she solicited the help of Lisa and her son in loading her things in a truck. In the early afternoon of July 7, Lisa took a telephone call for Mary. The caller told Lisa, "This is Mark. Can you tell Mary I'll be late?"

Later that afternoon, the defendant and Lynda went to a bridge at Lick Creek to go fishing. This location was a ten to twenty minute drive from Alan Duncan's house, where the defendant and Lynda were living at the time. Later that afternoon, Lynda and the defendant returned home. That evening, Lynda called in an order for some fish from a local restaurant. On her way to the restaurant to pick up the fish, she dropped the defendant off at Mary's house, where she noticed a truck backed into the driveway with its bed covered with a green tarp. Mary's neighbor watched as Mary met with the defendant. That was the last Mary's neighbor saw of Mary.

A woman who lives near the bridge at Lick Creek heard a gun shot around 9:00 to 9:30 p.m. Her husband convinced her someone was hunting, so the noise was

3

not investigated.

The defendant returned home around 10:20 p.m. driving the truck that had been at Mary's house earlier that day. The truck was still packed with Mary's personal belongings and covered with green tarp. Lynda asked the defendant if he had taken Mary to the interstate so that she could hitchhike to California. The defendant responded affirmatively and stated that he had watched Mary get into a car with two men.

Mary's body was found the next day, July 8, near the bridge at Lick Creek. She had a gunshot wound, caused by a large caliber bullet such as a .357 caliber gun, to the back of her head and an exit wound between her eyebrows. The nature of the wound indicated that the muzzle of the gun had been greater than twenty-four inches from the victim's head when the bullet was fired. The nature of the wound also indicated that the bullet would have caused immediate unconsciousness and death. Later that day, the defendant unloaded the back of the Ford truck he had driven home the previous night. The truck was filled with boxes and bags of Mary's clothing and other belongings. The defendant and Lynda also went to Cub's Den, where the defendant paid their bar tab.

That evening, Lynda spoke with the authorities, telling them that she and the defendant had been to the bridge at Lick Creek the previous day. Police authorities also questioned the defendant. The defendant was asked whether he could identify the victim from photographs taken at the crime scene, and the defendant replied that he did not know the victim. When questioned by an agent of the Tennessee Bureau of Investigation, however, the defendant admitted that he had met the victim in California and had known her for three years. He also claimed that on July 7, he did not leave

4

home the entire evening.

Lynda and Alan Duncan checked Alan's gun collection, which was kept in an unlocked gun cabinet in Alan's house. They discovered that one of the guns, a .357 caliber Magnum pistol that had been fully loaded a month or two prior, had an empty shell casing. Lynda threw the cartridge away, but at Alan's request, later retrieved it from the garbage can and set it on the dresser. The cartridge was later found by police in the garbage can, where police authorities also found a keyring with the name "Mary" on it, latex gloves, and two love letters from the defendant to Mary. The letters referred to Mary as the defendant's "precious wife" and were signed as "husband Mark." No fingerprints or DNA evidence were found at the scene of the crime or on any of the items recovered, including Alan's .357 caliber Magnum pistol. The bullet was also not recovered.

On July 10, a waitress at Cub's Den read an article in the local newspaper about the murder. The article described the victim. The waitress anonymously telephoned the police department and told the authorities that she thought the victim was Mary. She later spoke with police officers and was able to identify Mary's body and clothing from the crime-scene photographs.

On these facts, a jury found the defendant guilty of first-degree murder and theft of property valued five hundred dollars ($500) or less. Following a sentencing hearing, the defendant was sentenced to life incarceration for first-degree murder and a consecutive sentence of eleven months and twenty-nine days incarceration for theft. The defendant now appeals.

The defendant first argues that the trial court erred in failing to give the jury

a special instruction on circumstantial evidence. During the jury charge conference,

defense counsel requested the following special instruction:

> Before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant. A web of guilt must be woven around the defendant from which the defendant cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.

This special instruction is based on language found in State v. Wilson, 924 S.W.2d 648,

649 (Tenn. 1996)(quoting State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610 (1971)).

The trial judge denied the defendant's request, stating, "I do find that the pattern charge

substantially repeats that language, although not perhaps quite as eloquently, it has been

approved many times and I believe it is adequate to charge the jury today."

> The written jury instructions included in the record reflect the following

instruction on circumstantial evidence:

> Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred.

> When the evidence if made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt and the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense.

> It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged.[1]

---

[1] We note that the record fails to include a transcript of the instructions as read to the jury. Failure to include a transcript normally waives review of appellate issues pertaining to jury instructions because without a complete record, it is impossible for this Court to discern whether the written jury instruction conforms to the instructions as read to the jury and thus, whether error actually occurred. See T.R.A.P. 24(b); State v. Jones, 623 S.W.2d 129 (Tenn. Crim. App. 1981). In the instant case, however, we will review the issue presented, as the State does not dispute that the requested special jury instruction was not read to the jury.

This instruction is substantially similar to T.P.I.-Crim. 42.03 (4th ed. 1997), which has been cited with approval by this Court. See State v. Charles W. Sanderson, No. 01C01-9608-CR-00384, Wilson County (Tenn. Crim. App., filed September 19, 1997, at Nashville). When the instructions given are a correct statement of the law and fully and fairly explain the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987); see State v. West, 844 S.W.2d 144, 151 (Tenn. 1992). The instruction at issue here was accurate and fully and fairly explained the applicable law on circumstantial evidence. The defendant's requested instruction is nothing but a restatement, albeit a fancier restatement, of the same legal principles embodied by T.P.I.-Crim. 42.03 and the instruction given by the trial court. The trial court did not err in refusing to give the defendant's proposed special instruction instead of the instruction given.

Next, the defendant challenges his convictions for first-degree murder and theft of property valued five hundred dollars ($500) or less, arguing that the evidence is insufficient to support his convictions. When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We do not reweigh or re-evaluate the evidence and are required to afford the State the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn from the proof. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

As applicable to this case, first-degree murder is the premeditated and

intentional killing of another person.  T.C.A. § 39-13-202(a)(1) (1997).  Our Legislature has defined "premeditation" as "an act done after the exercise of reflection of judgment" and without excitement or passion. § 39-13-202(d).  Here, the evidence showed that the defendant's relationship with the victim had become complicated, to say the least.  The defendant had had an intimate relationship with the victim for several years.  When he and the victim moved in with Lynda, however, things began to get messy: The defendant developed another intimate relationship with Lynda, which caused he and Lynda to move out of the house and in with Alan, a friend of Lynda's.  Apparently, however, the defendant's intimate relationship with Lynda did not cause the end of his intimate relationship with the victim.  The defendant wrote love letters to the victim, in which he called the victim his "precious wife" and referred to himself as her "husband."  The romantic feelings conveyed by these love letters were consistent with the victim's belief that on the weekend of July 7, she and the defendant were again moving in together in a house they had previously viewed and selected together.

Meanwhile, however, the defendant had announced his plans to marry Lynda later in July.  The defendant said he intended to "get rid of" the victim.  On the night the victim was killed, the defendant was the last person to be seen with her.

Near the crime scene, which the defendant had visited earlier that day, a gun shot was heard between 9:00 and 9:30 that night.  The defendant returned home, which was only a ten to twenty minute drive from the crime scene, around 10:20 p.m. When the defendant returned home, he was driving the truck that had previously been at the victim's house.  He lied to Lynda by telling her he had driven the victim to the interstate so she could hitchhike to California and that he had seen her accept a ride from two men.  He also lied to the police about his whereabouts the evening of the murder,

8

telling them he was home the entire evening. His failure to identify the victim when shown photographs of the crime scene is also suspicious: He told the police he did not know the victim pictured in the photographs, even though he had known the victim intimately for years, whereas a waitress at a local bar, a mere casual acquaintance of the victim's, identified the victim's body and clothing from the same photographs.

The victim was shot in the back of the head by a large caliber gun, such as a .357, from a distance of more than twenty-four inches. The defendant had ready access to a .357 caliber Magnum pistol, which was kept in an unlocked gun cabinet in Alan's house, where the defendant was staying. The .357 caliber Magnum pistol, which had been fully loaded a month or two prior to the murder, carried a spent shell just a day or two after the murder. Although no fingerprints were found on the pistol, latex gloves were found in the trash can at Alan's house, the same trash can that also contained the victim's keyring and love letters from the defendant to the victim.

The totality of these circumstances, considered in the light most favorable to the State, justifies the conclusion that after the exercise of judgment, and without excitement or passion, the defendant intentionally killed the victim. See § 39-13-202(a)(1), (d). As such, the evidence is sufficient to support the defendant's conviction for first-degree, premeditated murder.

Theft occurs when a person, with the intent to deprive the owner of property, "knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (1997). Here, because the victim believed that she and the defendant were moving in together on the weekend of July 7, she solicited the help of her neighbors in packing her belongings in boxes and placing them in the back

9

of a pick-up truck. Following the victim's murder, the defendant returned home, driving that same truck. The next day, the defendant began unpacking some of the victim's belongings from the truck. The victim's keyring and love letters addressed to her were later found in the trash can in Alan's house. These circumstances are sufficient to support a conviction for theft of property under § 39-14-103.

Finally, the defendant argues that the trial court erred in ordering his eleven month, twenty-nine day sentence for theft to run consecutively to his life sentence for first-degree murder. The presentence report, as corrected by the parties during the sentencing hearing, reflects that the defendant, who was thirty-seven years old at the time of the murder, has fifteen prior convictions, which include the following: misdemeanor theft, five counts of petit larceny, burglary, two counts of third-degree burglary, aggravated assault, aggravated kidnapping, attempted felonious escape, obtaining property by false pretense, and federal convictions for burglary of a post office and theft. The defendant admits he has abused alcohol and used marijuana. Neither party presented any testimony or evidence other than the presentence report at the sentencing hearing.

For the first-degree murder charge, because the State did not seek the death penalty or a life sentence without the possibility of parole, the trial court imposed a sentence of life imprisonment with the possibility of parole. For the theft charge, based on the existence of several enhancing factors but no mitigating factors, the trial court imposed a sentence of eleven months and twenty-nine days incarceration.[2] The trial court then turned to T.C.A. § 40-35-115 in order to determine whether the theft sentence should run consecutively to the murder sentence. The trial court found that the defendant

---

[2]The length of this sentence is not challenged on appeal.

10

is a "professional criminal" who has knowingly devoted his life to criminal acts as a major source of income, § 40-35-115(b)(1); that the defendant is an offender with an extensive record of criminal activity, § 40-35-115(b)(2); and that the defendant is a "dangerous offender" whose behavior indicates little or no regard for human life and no hesitation for committing a crime in which the risk to human life is high, § 40-35-115(b)(4). As such, the trial court ordered the defendant's eleven month, twenty-nine day sentence for theft to run consecutively to his life sentence for first-degree murder.

A defendant who fits into any of the categories enumerated under § 40-35-115(b) qualifies for consecutive sentencing. Here, the record reflects that the defendant has fifteen prior convictions, fourteen of which are felony offenses. Additionally, the defendant admits he has used marijuana. These circumstances justify a finding that the defendant has an extensive record of criminal activity. § 40-35-115(b)(2).

"When a defendant falls within the statutory classifications for eligibility to be considered for consecutive sentencing, the only remaining considerations are whether (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) the terms are reasonably related to the severity of the offenses.'" State v. Zachery L. Barnes, No. 01C01-9704-CC-00138, Rutherford County (Tenn. Crim. App. filed March 5, 1998, at Nashville)(citing State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995)). Here, the trial court failed to make these findings on the record. Even so, the defendant exhibits a disregard for authority and refusal to adjust his behavior to society's standards, as evidenced by his history of violating parole and his conviction for attempted felonious escape. Moreover, the defendant's behavior has escalated to a more violent and dangerous nature, i.e., the premeditated murder of a victim by a bullet to the back of the head from a distance greater than two feet, followed by the theft of the

11

victim's belongings. Under such circumstances, consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from the defendant's misconduct. See Barnes, C.C.A. No. 01C01-9704-CC-00138.

The defendant contends, however, that based on the authority of the unreported case of State v. James E. Gordon, No. 01C01-9611-CC-00495, Williamson County (Tenn. Crim. App. filed February 5, 1998, at Nashville), concurrent sentencing is more appropriate than consecutive sentencing in the instant case. In Gordon, the defendant was convicted of first-degree, premeditated murder and aggravated burglary. The trial court sentenced him to life in prison without the possibility of parole on the murder conviction and to a consecutive six year sentence in prison on the aggravated burglary conviction. On appeal, this Court noted that because the defendant had already been sentenced to spend the remainder of his life in prison, requiring him to serve a consecutive six year sentence seemed "meaningless under our law." James E. Gordon, No. 01C01-9611-CC-00495, slip op. at 21. This Court further noted that "a consecutive sentence would not serve the purpose of protecting the public against further criminal conduct for a defendant who has already been sentenced to life without the possibility of parole." Id. For this reason, this Court modified the defendant's sentence to reflect a concurrent sentence rather than a consecutive sentence. Id.

The reasoning expressed in Gordon is simply inapplicable to the instant case. Unlike the defendant in Gordon, the defendant here was sentenced to life incarceration with the later possibility of parole. As such, consecutive sentencing would, in fact, serve to protect the public against any further criminal conduct of the defendant. Thus, the trial court did not abuse its discretion in imposing consecutive sentences.

12

Finding no merit to the defendant's arguments, we affirm the defendant's convictions and sentence.

_____
JOHN H. PEAY, Judge

CONCUR:

_____
THOMAS T. WOODALL, Judge

_____
L. TERRY LAFFERTY, Special Judge