IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2009

## STATE OF TENNESSEE v. PATTY SUE LAWRENCE

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16440     Lee Russell, Judge**

---

**No. M2009-01527-CCA-R3-CD - Filed June 17, 2010**

---

Appellant, Patty Sue Lawrence, was convicted of two counts of prostitution, a Class B
misdemeanor, and one count of submitting a false police report, a Class D felony. The trial
court ordered an effective sentence of three years in custody. She appeals, challenging the
sufficiency of the evidence and the trial court's denial of alternative sentencing. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are
Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON,
P.J., and JAMES CURWOOD WITT, JR., J., joined.

Andrew Jackson Dearing, III, Shelbyville, Tennessee, for the appellant, Patty Sue Lawrence.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney
General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles,
Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

On September 15, 2007, Appellant reported to the Shelbyville Police Department that
she had been raped. Appellant told Detective Charles Merlo that a man came to her house
to examine a computer Appellant wanted to sell. She also said that she had seen the man at
work and that she knew his first name was Brent. However, she did not know him well and
did not know his last name. She did, however, have a cellular telephone number for him; the

two had exchanged text messages. They also exchanged emails via the social networking website MySpace.

Detective Merlo quickly located the alleged perpetrator, Brent Curry. Mr. Curry told Detective Merlo a dramatically different story. Far from being interested in Appellant's computer, Mr. Curry said that he went to Appellant's house on September 15 because she was a prostitute and that it was not the first time he had been there. Six months earlier, Mr. Curry had sex with Appellant at her house in exchange for $100. According to Mr. Curry, he and Appellant had sex on September 15 in exchange for $50. Mr. Curry also had a series of email and text messages corroborating his story, including one containing Appellant's price list.

Detective Merlo confronted Appellant with the information he had uncovered. In a videotaped interview, Appellant persisted in her computer purchase-turned-rape allegation. She then told Detective Merlo that she recalled Mr. Curry's visit to her house six months earlier, but that she did not remember whether they had sex. Shortly thereafter, she admitted that they had sex in the earlier meeting and that Mr. Curry paid her $100. She continued to insist that the September meeting was about a computer purchase, and she demanded a lawyer before answering any more questions.

At the conclusion of the second interview, Appellant was arrested and charged with two counts of prostitution and one count of filing a false report.

The State's first witness at trial was Patrolman David Curley of the Shebyville Police Department. Officer Curley was dispatched to investigate the alleged rape at around 8:20 p.m. on September 15, 2007. Officer Curley met Appellant and her neighbor, Mark Helton, at Mr. Helton's house. Officer Curley testified that Appellant told him that she had been forcibly raped by a man named Brent. She also told Officer Curley that Brent was a acquaintance from work and MySpace. Appellant said that she knew Brent was coming to her house but that she believed he was coming to look at a computer she was trying to sell.

Officer Curley testified that Appellant told him that Brent arrived at her house around 6:30 p.m. Appellant let Brent in, and they talked briefly about the computer. Appellant said that when she turned to plug in the computer's speakers, Brent grabbed her by the hair, pushed her onto her bed, latched her hands together with a belt, and vaginally and anally raped her. Afterward, Brent got up, washed off with a washcloth, and left, telling Appellant not to move for ten minutes. After ten minutes, Appellant got up, washed off, and went to Mr. Helton's to report the crime.

Officer Curley testified that he saw red marks on Appellant's wrists but not until she mentioned them. He described them as "light pink marks" and noted that "they weren't cuts or gashes" and that "there was no blood." He also testified that he believed the marks were thinner than the typical men's belt but that they were "relatively fresh."

Officer Curley recalled that Appellant was "highly upset" and "crying" when he arrived. She had difficulty answering questions. He noticed that Appellant calmed down when Mr. Helton left the room. When Mr. Helton left, Appellant began to answer questions; however, when Mr. Helton returned, Appellant again got upset. As Officer Curley explained, "[i]t's like she was looking . . . for [Mr. Helton] and she would get more upset" when he was present. Officer Curley also testified that "she would calm back down once [Mr. Helton] left or . . . his attention was elsewhere."

Officer Curley acknowledged that he did not enter Appellant's house during his September 15 investigation and that he did not know if Appellant's computer was "laid out."

The State then called Mr. Curry. Mr. Curry testified that he met Appellant, whom he knew as Patty Palmer, on MySpace in February 2007. Mr. Curry saw Appellant's MySpace page and asked her for a date. Appellant responded that she did not date but that she was an escort, which Mr. Curry took to mean she was a prostitute. Mr. Curry asked Appellant for a price list, and she responded that she charged $50 per hour and $100 per night. The two then exchanged telephone numbers.

Mr. Curry testified that he and Appellant met in March 2007 to trade money for sex. The meeting, which was set up via text messages, was to take place at a convenience store near Appellant's house. The two met, talked for a few minutes, and then went to Appellant's house. When they arrived at Appellant's house, they went straight to the bedroom, where they had oral, vaginal, and anal sex. Mr. Curry testified that the visit lasted about two hours and that he paid Appellant $100 cash.

Mr. Curry testified that he and Appellant did not meet again until September 15. They did not see each other at Appellant's place of business. Mr. Curry testified that he had never been to Appellant's workplace. Instead, they occasionally exchanged email or text messages. Mr. Curry estimated that the two exchanged text messages about ten times and exchanged emails approximately twenty times. The messages were generally about sex. Sometime before September 15, Mr. Curry sent Appellant a text message requesting sex. Appellant responded with a text message that said she was in Chicago and would be back in a couple of weeks. Appellant later emailed Mr. Curry saying she had returned.

Mr. Curry testified that he contacted Appellant on September 15, asking to see her. He went to Appellant's house, and they again had oral, vaginal, and anal sex. Mr. Curry stayed about one hour and paid Appellant $50 cash. Mr. Curry denied forcing Appellant to have sex. He also denied restraining Appellant and displaying a knife. He said that he did not notice any marks on Appellant's wrists. He testified that Appellant was not upset at the end of the episode, nor did she complain about the amount he paid her. Instead, Mr. Curry testified that Appellant said, "Brent, that was damn good." Moreover, Mr. Curry said he did not know Appellant had a computer for sale and denied ever discussing such a sale.

Mr. Curry explained that he had worn the same belt every day for the last five years. He had the belt on at trial, and he displayed it for the jury. He testified that he was wearing the same belt on the evening of the alleged rape.

Mr. Curry admitted that he had patronized two other prostitutes approximately five times. He testified that prostitutes use a variety of terms to describe transactions that include oral, vaginal, and anal sex. Mr. Curry generally referred to it as "around the world," but he noted that Appellant called it "all night."

Detective Merlo contacted Mr. Curry a few days after the September 15 meeting. Detective Merlo told Mr. Curry that he was a suspect in a rape investigation and asked him to come to the police station to answer some questions. Mr. Curry agreed. During the initial interview, Mr. Curry freely admitted that he was at Appellant's house on September 15; that he went there for sex; that the two had oral, vaginal, and anal sex; and that he paid Appellant $50. Mr. Curry also told Detective Merlo about the text messages the two had exchanged. He showed Detective Merlo a September 15 text message requesting a meeting and the Appellant's September 15 response that said Mr. Curry was "welcome to come to her house any time." Mr. Curry then showed Detective Merlo a reply message he sent asking how much Appellant would charge for one hour, as well as Appellant's response which read, "same as last time."

Mr. Curry was charged with two counts of patronizing prostitution, and he pled guilty to one count in exchange for the State dismissing the second charge. Mr. Curry served 48 hours in jail and was placed on probation.

Finally, Mr. Curry admitted on cross-examination that he had sent Appellant three or four text messages after he discovered she had accused him of rape. Mr. Curry testified that he sent the text messages, which were angry but not threatening, because he was mad at her. He sent the last message in either January or February 2008.

The State then called Detective Merlo. Detective Merlo had been in the Criminal Investigation Division since October 2006 and had been with the Shelbyville Police Department for about ten years. He testified that he was almost always the lead investigator for the department in cases involving domestic violence, crimes against children, and crimes against women.

Detective Merlo recalled that his first contact with Appellant was at the police station late on the night of September 15. She had already been to the hospital and completed a Tennessee Bureau of Investigation rape kit.

Detective Merlo testified that he treated the investigation like any other rape case. He began by asking Appellant to write a statement of what happened. He then conducted a videotaped interview, which was played for the jury. During the interview, Appellant told Detective Merlo that she was raped by a man named Brent, who was a friend of a co-worker. She explained that she believed Brent was interested in purchasing her computer and that her work friend set up the meeting. However, Appellant also said that she had mentioned the computer to so many people that she did not know who told Brent about it or how he knew where she lived. Later in the interview, Appellant was unable to recall which co-worker knew Brent.

In the interview, Appellant stated that she communicated with Brent via email and text messages a few weeks prior to September 15. She said that she had a MySpace account but that she did not use it to correspond with Brent. She initially told Detective Merlo that the last text message she received was about two days prior to the September 15 meeting. However, Appellant also said that she knew Brent was coming over that night. Later in the interview she said that the last text message from Brent was on the morning of September 15 and that it concerned the price of the computer. She also told Detective Merlo that her exchanges with Brent may have been sexually charged but that she did not recall if they were.

Appellant then described the rape to Detective Merlo. She said that Brent used what felt like a thin belt to tie her hands together. She explained that she was face-down, so she did not see what he used to tie her hands. She also said that he had a bowie knife, which he showed her but did not unsheathe.

Detective Merlo testified that he saw the laptop computer Appellant claimed she was trying to sell. He also saw "narrow red marks" on Appellant's wrists. He noted that they were a "rosy color" and that her skin showed no indentation, abrasion, or bruising. He recalled that the marks were narrower than the belt Mr. Curry was wearing at trial.

Detective Merlo testified that his investigation revealed that "Brent" was actually Mr. Curry. He said that the cellular telephone associated with the number Appellant provided was a pre-paid account and that he was unable to use it to obtain any information about Mr. Curry. He discovered a picture on a MySpace page, and another Shebyville police officer recognized the man as Mr. Curry and knew where he worked. Detective Merlo went to Mr. Curry's workplace and found a truck that matched the description of the alleged assailant's truck. The truck was registered to Mr. Curry. Detective Merlo then called the number Appellant gave him, and Mr. Curry answered.

Detective Merlo informed Mr. Curry that he was a suspect in a rape investigation and he requested an interview. Mr. Curry said he was out of town at the time but agreed to an interview when he returned. Detective Merlo testified that during the interview, Mr. Curry freely admitted having sex with Appellant at her house on September 15 but denied raping her. He also told Detective Merlo that he had sex with Appellant at her house six months earlier. He said he paid Appellant $100 in exchange for sex. Detective Merlo testified that throughout his investigation, he had not discovered any lies or inconsistencies in Mr. Curry's statement.

Detective Merlo testified that at the initial interview he asked Mr. Curry if he knew "a Patty." Mr. Curry responded that he believed he knew her and explained that they had exchanged text messages the day of the rape. He showed Detective Merlo the telephone number associated with a series of text messages to clarify that Appellant was the woman to whom Detective Merlo was referring. The number on the text messages was Appellant's number.

Detective Merlo testified that he reviewed a series of September 15 text messages between Mr. Curry and Appellant. The first message was sent at 7:17 a.m. and said, "I will call you tonight about 7." Mr. Curry received a reply from Appellant's number at 5:19 p.m. that said, "[y]ou know you're more than welcome here. I live completely alone, plus I haven't had a day off in so long, I have had a couple of beers or three." Mr. Curry then sent another message at 6:02 p.m. that said, "How much for hour or so?" He received a response from Appellant's telephone number at 6:07 p.m. that said, "Same as before, period. Let me know when you get here if you come because my stereo is loud. I have some beer if you drink."[1]

---

[1] It is unclear from the record whether the word "period" was in the text message or was added by Detective Merlo while reciting the text message.

Detective Merlo testified that he called Appellant on September 17 but that she did not answer. She returned his call the next day. Their conversation was limited to whether Brent had tried to contact Appellant again. Appellant told Detective Merlo that he had not.

Detective Merlo next talked to Appellant on September 27. Detective Merlo asked Appellant to return to the police station for a second interview. Between September 18 and September 27, Detective Merlo had no contact with Appellant; she did not inquire about the investigation during that time.

The Appellant's second interview was recorded onto a DVD, which was also played for the jury. Appellant told Detective Merlo at the beginning of the interview that Brent had sent her two text messages asking "to get together."

Later in the interview, Appellant acknowledged that Mr. Curry came to her house six months earlier, but she claimed that she did not recall if they had sex. She said that she had been drinking that day. She said that she was not supposed to drink because mixing alcohol with her brain tumor medication could cause her to black out. When pressed, Appellant admitted that Brent paid her $100 for sex during that meeting. Nevertheless, she stood by her story that Brent came to her house on September 15 under the pretense of buying a computer and that she did not know he intended to have sex. Detective Merlo testified that near the close of the September 27 interview, Appellant said, "[J]ust forget everything, just drop it, just forget it. I'm guilty." Appellant then requested a lawyer, and Detective Merlo immediately terminated the interview and arrested her.

Detective Merlo also testified that he sent Appellant two controlled text messages during his investigation. The first said, "[H]ello, I got your number from a friend who said you liked to get down, is that true?" Appellant responded, "[Y]ou have got the wrong person, please, don't contact me again." Detective Merlo sent a second message that said, "[H]ey, can we hook up tonight, $200?" Appellant responded, "[L]eave me alone." Detective Merlo testified that during the September 27 interview, Appellant showed him the text messages but said she did not know who sent them.

The State rested its case at the conclusion of Detective Merlo's testimony. Appellant did not put on any evidence in her defense. The jury found Appellant guilty of all three counts.

The trial court held a sentencing hearing on October 2, 2008. The State put on no evidence at the hearing, relying instead up on the presentence investigation report and the testimony from trial. The Appellant testified on her own behalf.

In her testimony, Appellant said that she was born and raised in Chicago. She moved to Tennessee in 1993 at the request of her ex-husband. Prior to moving, she attended the Illinois Institute of Technology for dialysis training. At the time of the offenses in this case, she was employed by a company called Blood Assurance. She had worked for the company for two years and was terminated when she was arrested. Prior to working for Blood Assurance, Appellant worked for a hospital for two years and for Vanderbilt University for eight years.

Appellant testified that she had both physical and mental ailments, including a benign brain tumor. She testified that she remained under a doctor's care but was no longer on medication. She said that the tumor did not pose a serious medical problem. She also testified that she began taking medication for depression after her brother's suicide.

Appellant admitted that she had a 2004 conviction for domestic assault and that her ex-husband was the victim in that case.

Appellant admitted that she engaged in prostitution during the March 2007 meeting with Mr. Curry. However, she maintained that he raped her on September 15. She denied that the September visit was for the purpose of prostitution.

Mr. Helton also testified on Appellant's behalf. He explained that he was Appellant's neighbor and friend. He also dated Appellant from January 2004 until January 2005.

Mr. Helton recalled that he saw Mr. Curry's truck arrive at Appellant's house on September 15 and that he saw the truck leave about an hour later. Appellant came to Mr. Helton's house after the alleged rape on September 15.

Mr. Helton testified that he had noticed changes in Appellant's demeanor since her brother's suicide. He noted that Appellant cried often, had mood swings, and slept excessively.

Mr. Helton said Appellant used his computer to access her MySpace account, and he helped investigators access the MySpace account during their investigation. While examining Appellant's MySpace account, Mr. Helton discovered emails between Mr. Curry and Appellant that discussed sex. He also found an email from a different individual that suggested Appellant would have sex for money.

At the close of evidence, Appellant argued for a sentence of split confinement. She contended that her work history and her history of mental problems qualified as mitigating factors under Tennessee Code Annotated section 40-35-113(13).

-8-

The court denied alternative sentencing and ordered an effective sentence of three years in custody. The court applied an enhancement factor based upon Appellant's criminal history under Tennessee Code Annotated section 40-35-114(1). That history included: (1) a September 2007 conviction for driving on a revoked license; (2) a July 2004 conviction for driving on a suspended license and tampering with her vehicle identification; (3) an October 2004 conviction for reckless driving; (4) a June 2004 conviction for domestic assault; (5) four traffic offenses between 1997 and 1999; (6) a July 1994 conviction for passing worthless checks under $100; and (7) misdemeanor convictions in Bedford, Coffee, and Rutherford Counties under different names. The court noted that although "not the most serious record . . . it is an extensive record," spanning thirteen years. It noted that Appellant had a good work history but that it was not a mitigating factor in Appellant's case. It also noted that Appellant was not entitled to mitigation based upon her claim of suffering from depression because there was no connection between her condition and the offenses. In particular, the trial court noted that on the DVD, Appellant did not appear depressed but, in fact, was "jovial" and "chatty" with the investigator. Thus, the court concluded, no mitigating factors applied. Furthermore, the court noted that the videos of Appellant's interviews "made it clear that she was not telling the truth, that she knew she was not telling the truth, and at the end of the process that she knew she was caught."

As to the manner of service, the court acknowledged that Appellant should be considered a favorable candidate for alternative sentencing but concluded that alternative sentencing was not appropriate. It specifically found that Appellant had "very little potential for rehabilitation" and that "there is a high risk that she will commit a crime again." Based on Appellant's lack of truthfulness, the seriousness of the false allegations of rape, and Appellant's significant criminal record, the court denied alternative sentencing.

Appellant now appeals, contending that the State presented insufficient evidence and that the trial court erred in denying alternative sentencing.

## II. Analysis

### A. Sufficiency Of The Evidence

We begin with Appellant's sufficiency arguments. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d

832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. See id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). Moreover, while a guilty verdict may result from purely circumstantial evidence, in order to sustain the conviction the facts and circumstances of the offense "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

Appellant contends that the State's case on the charge of filing a false report was "partially circumstantial." She cites to Tennessee case law holding that in order to convict on circumstantial evidence alone, the evidence must be inconsistent with innocence and exclude every other reasonable theory or hypothesis except the defendant's guilt. See, e.g., Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). Specifically, she argues:

> In the case at hand the facts and circumstances of [Appellant's] mental state are not so closely interwoven and connected that a conviction will stand. The State failed to carry the burden of proof required and the evidence as presented was not of the weight and sufficiency to justify a verdict of guilty.

We have no difficulty concluding that there was sufficient evidence to convict on all counts. First, for the jury to convict Appellant of prostitution under counts one and two there must be evidence that she "engage[d] in prostitution," Tenn. Code Ann. § 39-13-513(a), which is defined, in pertinent part, as "engaging in, or offering to engage in, sexual activity as a business," id. § 512(5). Section 512 defines "sexual activity" as "any sexual relations." Id. § 512(6). Appellant confessed to having sex with Mr. Curry for money in March 2007. Mr. Curry also gave detailed testimony that he had sex with Appellant for money on September 15, 2007, and in March 2007. Additionally, the text messages and emails between Appellant and Mr. Curry regarding the prices Appellant charged provide further evidence of prostitution on those dates. Quite simply, there was sufficient evidence to convict Appellant on both counts of prostitution.

The evidence was also sufficient to convict Appellant of filing a false report. Tennessee Code Annotated section 39-16-502(a)(1) provides, in pertinent part, that it is unlawful to:

> Initiate a report or statement to a law enforcement officer concerning an offense or incident within the officer's concern knowing that:
> (A) The offense or incident reported did not occur; . . . or
> (C) The information relating to the offense reported is false.

The evidence presented at trial revealed that Appellant filed a report with the Shelbyville Police Department alleging that she was raped on September 15, 2007. The evidence also revealed that Appellant completed a written statement of the alleged rape and provided two recorded interviews in which she maintained that an acquaintance named Brent raped her when he came to her home to inspect her computer. Mr. Curry testified that he had sex with Appellant on September 15 but that it was consensual and done in exchange for $50. Furthermore, the case's lead investigator testified that he discovered emails and text messages indicating that Appellant offered Mr. Curry sex for money on September 15. The officers to whom Appellant made the report testified at trial. In addition, the alleged rapist testified as a direct eye witness about the September 15 meeting. Moreover, the State presented a videotape showing Appellant admitting that she lied about the rape. Further, the trial court properly instructed the jury concerning circumstantial evidence. We are satisfied there was sufficient evidence to lead the jury to its conclusion.

## B. Sentencing

We turn now to Appellant's sentencing argument. Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by Appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on Appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. See id. at (d); Ashby, 823 S.W.2d at

169. However, in sentencing on misdemeanor convictions, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998).

The Sentencing Reform Act of 1989 encourages judges to utilize non-incarceration sentencing alternatives. See Tenn. Code Ann. § 40-35-103(6); see also State v. Ring, 56 S.W.3d 577, 585 (Tenn. Crim. App. 2001). But the Act also provides that certain offenders should be considered "favorable candidate[s] for alternative sentencing." Tenn. Code Ann. § 40-35-102(6). Because Appellant is a Class D felony offender, she is among those considered "favorable candidate[s]." Id. Yet, she may nonetheless be sentenced to incarceration based upon the trial court's determination that:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1). The trial court may also consider the applicable mitigating and enhancing factors under Tennessee Code Annotated sections 40-35-113 and 40-35-114 as well as "the potential or lack of potential for rehabilitation" in determining whether incarceration is appropriate. State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996); see also Tenn. Code Ann. § 40-35-103(5).

The trial court did not err in denying alternative sentencing. We begin by noting that, contrary to Appellant's contention, she is not "presumed" to be a favorable candidate for alternative sentencing. Rather, she is merely "considered as a favorable candidate for alternative sentencing." Tenn. Code Ann. § 40-35-102(6). Regardless, the trial court's well-reasoned ruling adequately explained why alternative sentencing was not appropriate. In particular, the trial court commented upon the seriousness of Appellant's rape allegation as well as her refusal to accept responsibility for filing a false report. Additionally, the presentence report demonstrates that Appellant has a long history of criminal behavior, indicating that alternative sentencing is not appropriate. Furthermore, the trial court concluded that Appellant presented little potential for rehabilitation. The record supports the trial court's findings, and our review gives us no reason to question its sentence.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the trial court's judgments.


_____
NORMA McGEE OGLE, JUDGE